IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
_____

DEOZ MILLER-HARRIS,

                            Plaintiff,              Civil Action No.
                                               9:16-CV-0541 (FJS/DEP)

    v.

DAVID DINELLO,

                            Defendant.
_____

APPEARANCES:                 OF COUNSEL:

FOR PLAINTIFF:

DEOZ MILLER-HARRIS, *Pro se*
13-B-2224
Southport Correctional Facility
P.O. Box 2000
Pine City, NY 14871

FOR DEFENDANT:

HON. BARBARA D. UNDERWOOD     MATTHEW P. REED, ESQ.
New York State Attorney General     Assistant Attorney General
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

This is a civil rights action brought by *pro se* plaintiff Deoz Miller-Harris, a New York State prison inmate, against defendant David Dinello, a licensed physician employed by the New York State Department of Corrections and Community Supervision ("DOCCS"), pursuant to 42 U.S.C. § 1983. In the action, plaintiff alleges he was denied adequate medical treatment following an injury sustained as a result of his participation in a fight with a fellow inmate.

Currently pending before the court is a motion brought by defendant Dinello seeking the entry of summary judgment dismissing plaintiff's complaint. For the reasons set forth below, I recommend that defendant's motion be granted.

I.    <u>BACKGROUND</u>[1]

Plaintiff is an inmate currently in the custody of the DOCCS. *See generally* Dkt. No. 1. At the times relevant to his claims in this action, plaintiff was incarcerated first in the Auburn Correctional Facility ("Auburn"), located in Auburn, New York, and subsequently in the Southport Correctional Facility ("Southport"), located in Pine City, New

---

[1]    In light of the procedural posture of this case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in the non-movant's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

York. *Id.*; *see also* Dkt. No. 44-4 at 6.

On September 4, 2015, while confined at Auburn, plaintiff injured his right hand during the course of a fight with another inmate at the facility. Dkt. No. 1 at 7; Dkt. No. 44-4 at 2; *see also* Dkt. No. 45 at 2. Following the incident, plaintiff was taken to the facility's infirmary for evaluation and treatment. *Id.* Upon examination it was noted that plaintiff's right hand was slightly swollen and that he had a potential boxer's fracture; no other injuries were noted.[2] Dkt. No. 1 at 7; Dkt. No. 45 at 2, 4. To treat his resulting pain and swelling, the medical staff at Auburn provided plaintiff with an ice pack and Motrin, an over-the-counter anti-inflammatory medication, and recommended that he be sent outside of Auburn to an emergency room for an x-ray. Dkt. No. 1 at 7; Dkt. No. 44-4 at 3; Dkt. No. 45 at 2, 4.

In light of the recommendation that plaintiff be sent for an outside x-ray, defendant Dinello, a DOCCS Regional Medical Director responsible for managing physicians and medical staff at ten DOCCS facilities, was contacted on the evening of September 4, 2015. Dkt. No. 44-4 at 3. After

---

[2]     The term "boxer's fracture" is slang for the fracture of one of the metacarpal bones of the hand. Dkt. No. 44-4 at 2. A fracture of that nature typically occurs when a person strikes an object with a closed fist. *Id.* at 3. The most common types of boxer's fractures occur to the fourth or fifth metacarpals, leading to the ring finger and pinky finger, respectively. *Id.*

reviewing the matter, defendant Dinello concluded that the situation was not urgent and, due to the fact that there is an x-ray machine available at Auburn, he directed the medical staff at Auburn to cancel the trip to an outside emergency room and advised that an x-ray should be taken at Auburn as early as the following Tuesday, September 8, 2015.[3] Dkt. No. 1 at 7-8; Dkt. No. 44-4 at 3-4.

Plaintiff's hand was ultimately x-rayed at Auburn on September 18, 2015. Dkt. No. 44-4 at 5; Dkt. No. 45 at 3; Dkt. No. 45-1 at 6. Based upon the x-ray, plaintiff's right hand injury was noted to be a "[b]oxer's fracture of the distal fifth metacarpal with moderate volar angulation . . . noted." Dkt. No. 45 at 3; Dkt. No. 49 at 52. The fifth metacarpal leads to what is commonly known as the pinky finger. Dkt. No. 44-4 at 3. Plaintiff's fracture was characterized as "non-healing," meaning that it was in the process of healing but had not yet completely healed. Id. at 5; Dkt. No. 45 at 2, 5; Dkt. No. 45-1 at 6. Following the x-ray, medical staff members at Auburn wrapped plaintiff's hand in a bulky dressing for stabilization and submitted a request that plaintiff be seen by an outside orthopedic physician. Dkt. No. 44-4 at 5; Dkt. No. 45 at 5.

---

[3]    Defendant's request for an x-ray of plaintiff's hand was entered in the DOCCS Health Services System on September 18, 2015. Dkt. No. 44-4 at 4; Dkt. No. 45-1 at 3.

Almost daily between September 5, 2015 and September 18, 2015, plaintiff submitted several sick call requests. Dkt. No. 1 at 8; Dkt. No. 49 at 35-43. In response to those requests, plaintiff was informed that he was not on the sick-call list and therefore could not be seen by medical personnel. Dkt. No. 1 at 8. Defendant Dinello was never notified by staff at Auburn that plaintiff had submitted sick-call requests or needed to see a doctor. Dkt. No. 44-4 at 5.

Plaintiff's hand was examined by an orthopedic physician on September 28, 2015, and placed in a hard cast. Dkt. No. 1 at 8; Dkt. No. 44-4 at 5; Dkt. No. 45 at 5. The cast was subsequently removed on November 2, 2015, and plaintiff's hand was again examined by an orthopedic physician and x-rayed on that date. Dkt. No. 1 at 8; Dkt. No. 44-4 at 6; Dkt. No. 45 at 6; Dkt. No. 45-1 at 7. At that time the x-ray revealed that plaintiff's fracture had healed fully and there was no malrotation to the pinky, meaning that it was moving and rotating properly. Dkt. No. 44-4 at 6; Dkt. No. 45 at 6.

Plaintiff was transferred from Auburn into Southport on December 11, 2015. Dkt. No. 44-4 at 6; Dkt. No. 44-7 at 2. He was seen at Southport during sick call on January 9, 2016, complaining of swelling to his right hand and decreased range of mobility. Dkt. No. 44-4 at 6; Dkt. No. 45 at 8.

Upon examination medical personnel at Southport determined that plaintiff's third knuckle on the pinky finger of his right hand revealed some swelling but that plaintiff had good flexion, meaning the ability to bend it, with limited extension and minimal pain. *Id.* Three days later, on January 11, 2016, medical staff at Southport requested that plaintiff's right hand again be x-rayed. Dkt. No. 44-4 at 6; Dkt. No. 45 at 7.

On January 17, 2016, plaintiff was seen by medical staff at Southport, again complaining of right hand pain and swelling at the base of his pinky finger. Dkt. No. 44-4 at 6; Dkt. No. 45 at 7. Plaintiff was given Tylenol, a non-prescription pain reliever, because plaintiff indicated that Motrin was not effective for controlling his pain. *Id.* Plaintiff subsequently refused to have his hand x-rayed on January 27, 2016. Dkt. No. 44-4 at 7; Dkt. No. 45 at 9.

Plaintiff was again seen during sick call at Southport on April 13, 2016, with continuing complaints of swelling and pain in his right hand, and a request that it be x-rayed. Dkt. No. 44-4 at 7; Dkt. No. 45 at 10. Based upon that visit, medical personnel at Southport made a request to defendant Dinello for an x-ray of plaintiff's right hand; that request was approved. *Id.* Plaintiff's right hand was thereafter x-rayed at the Arnot Ogden Medical Center on April 20, 2016. Dkt. No. 44-4 at 7; Dkt. No. 45 at

11. That x-ray revealed no acute (meaning new) fracture or dislocation, and that the carpal bones had normal anatomic alignment, meaning that the knuckle was not sagging, and there was no soft tissue swelling. *Id.*

Plaintiff's hand was evaluated on several occasions by Southport medical staff in 2016, and he was provided with over-the-counter anti-inflammatory and pain reliever medication, as well as physical therapy twice a week for four weeks in July 2017. Dkt. No. 44-4 at 7-8; *see* Dkt. No. 45 at 13-24.

II.   PROCEDURAL HISTORY

Plaintiff commenced this action on or about May 11, 2016. Dkt. No. 1. His complaint names only Dr. David Dinello as a defendant, and asserts deliberate indifference to plaintiff's serious medical needs in violation of the Eighth Amendment and seeks compensatory damages in the amount of $25,000 and an order directing "that the basic guidelines be adhered to regarding medical attention being provided to prisoners." *Id.* at 9.

On September 5, 2017, following the close of discovery, defendant Dinello moved for the entry of summary judgment dismissing plaintiff's claims. Dkt. No. 44. In that motion defendant argues that (1) plaintiff has failed to establish the existence of a serious medical need; (2) the record reflects that plaintiff received adequate medical care for his injuries

sustained on September 4, 2015; (3) plaintiff has failed to establish the personal involvement of defendant Dinello in denying him sick call from September 5, 2015 to September 18, 2015; and (4) subjectively, plaintiff has failed to demonstrate that defendant Dinello had a sufficiently culpable state of mind to support an Eighth Amendment violation. Dkt. No. 44-2. Plaintiff submitted opposition to defendants' motion on October 2, 2017.[4] Dkt. No. 49. Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and the Northern District of New York 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

    A.    Legal Significance of Plaintiff's Failure to Respond to Defendant's Statement of Undisputed Material Facts

Although plaintiff has opposed defendant's motion for summary judgment, he did not file an opposition to defendant's Local Rule 7.1(a)(3) Statement of Material Facts. *See generally* Dkt. No. 49. By its terms, Local Rule 7.1 provides, in part, that "[t]he Court shall deem admitted any

---

[4]    Plaintiff's response in opposition to defendant's motion includes a document entitled "Notice of Motion," which, though equivocal, appears to request an order "grant[ing] plaintiff's complaint in its entirety[.]" Dkt. No. 49-1 at 2. To the extent that submission may be construed as requesting summary judgment in his favor, it is denied based upon plaintiff's failure to comply with the court's local rules, including to submit a statement of material facts not in dispute pursuant to Local Rule 7.1(a)(3).

properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced a non-movant's failure to properly respond. *See*, *e.g.*, *Elgamil v. Syracuse Univ.*, No. 99-CV-0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases).[5] Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Serv. Comm'n*, 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado*, No. 96-CV-0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins*, No. 09-CV-0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.). Here, because plaintiff was warned of the consequences of failing to properly respond to defendant's

---

[5]    All unreported cases cited to in this report have been appended for the convenience of the *pro se* plaintiff.

Local Rule 7.1 Statement, Dkt. No. 46 at 2, and he has failed to do so, I will deem defendant's facts contained in his Local Rule 7.1(a)(3) Statement as having been admitted to the extent they are supported by accurate record citations. *See, e.g., Latouche*, 2011 WL 1103045, at *1; *see also Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir.1996). As to any facts not contained in defendant's Local Rule 7.1(a)(3) Statement, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

     B.    <u>Legal Standard Governing Motions for Summary Judgment</u>

     Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

C.    Merits of Plaintiff's Medical Indifference Claims

In his complaint plaintiff alleges that his Eighth Amendment rights were violated by the inadequate treatment of his metacarpal fracture. Dkt. No. 1 at 8-9. In his motion, defendant contends no reasonable factfinder could conclude that he was deliberately indifferent to plaintiff's serious medical needs. *See generally* Dkt. No. 44-2.

The Eighth Amendment prohibits punishment that is "incompatible with the evolving standards of decency that mark the progress of a maturing society[,] or which involve the unnecessary and wanton infliction of pain[.]" *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quotation marks and citations omitted)). While the Eighth Amendment "does not mandate comfortable prisons, . . . neither does it permit inhumane ones[.]" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quotation marks and citation omitted). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle*, 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, . . . may actually produce physical torture or lingering death, [and] . . . [i]n less serious cases, . . . may result in pain and suffering which no one suggests would serve any penological purpose." *Id.* (quotation marks and citations omitted).

12

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, 697 F. Supp. 2d 344, 356 (E.D.N.Y. 2010). To meet the objective requirement, the alleged deprivation must be "sufficiently serious." *Farmer*, 511 U.S. at 844; *see also Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) ("[T]he objective test asks whether the inadequacy in medical care is sufficiently serious."). Factors informing this inquiry include "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (quotation marks and alterations omitted). Determining whether a deprivation is sufficiently serious requires a court to examine the seriousness of the deprivation, and whether the deprivation represents "a condition of urgency, one that may produce death, degeneration, or extreme pain[.]" *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quotation marks omitted). Importantly, it is "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in

the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases . . ., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.*; *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839-40).

In this case, no reasonable factfinder could conclude either that plaintiff's injury was sufficiently serious or that, even assuming plaintiff suffered a serious injury, defendant Dinello acted with deliberate

14

indifference in treating it. Defendant has submitted evidence suggesting that "[a] boxer's fracture is not typically a life-threatening condition capable of causing death, degeneration, or extreme pain." Dkt. No. 44-4 at 3. He notes further that such a fracture typically does not involve functionality of the hand, nor does it interfere with a patient's ability to engage in everyday activities "such as eating, drinking, and writing." *Id.* According to defendant Dinello, "[a] boxer's fracture typically heals correctly without treatment or medication." *Id.* Based on this evidence, which has not been disputed by plaintiff, I find that no reasonable factfinder could conclude that, by suffering a boxer's fracture to his right hand, he experienced a sufficiently serious injury for purposes of the objective inquiry of an Eighth Amendment deliberate indifference claim. *See, e.g., Dawkins v. Whalen*, No. 04-CV-0943, 2009 WL 222975, at *11 (N.D.N.Y. Jan. 28, 2009) (Suddaby, C.J., *adopting report and recommendation by* DiBianco, M.J.) (finding that an injury to the tip of the plaintiff's left ring finger was not sufficiently serious where the finger remained swollen two weeks after the injury, a nurse applied a split to treat the injury, and the plaintiff was able to flex and extend his finger without difficulty); *Magee v. Childs*, No. 04-CV-1089, 2006 WL 681223, at *4-5 (N.D.N.Y. Feb. 27, 2006) (Treece, M.J.) *report and recommendation adopted by* 2006 WL 1555588 (N.D.N.Y.

June 6, 2008) (Sharpe, J.) (concluding that the plaintiff's pleading failed to state a cognizable deliberate medical indifference claim because an allegation that the plaintiff suffered a broken finger did not satisfy the objective element); *Rivera v. Johnson*, No. 95-CV-0845, 1996 WL 549336, at *2 (W.D.N.Y. 1996) ("A broken finger, without more, simply does not present a condition of urgency of the type that may produce death, degeneration or extreme pain which correspondingly merits constitutional protection.").

I note, moreover, that the record fails to disclose the existence of any unconstitutional lapse in treatment of plaintiff's injury. While there was a delay of two weeks in arranging for an x-ray of plaintiff's hand, according to defendant, a boxer's fracture will not begin to heal until a few weeks have passed, and thus a delay of two weeks still provides medical staff with the ability to diagnose and treat the injury. Dkt. No. 44-4 at 4. In any event, a delay in providing an x-ray for that injury of two weeks does not rise to a level sufficient to establish medical indifference. *Ocasio v. Deluke*, No. 08-CV-0051, 2010 WL 6001595, at *14 (N.D.N.Y. Sept. 3, 2010) (Homer, M.J.) *report and recommendation adopted by* 2011 WL 864898 (N.D.N.Y. Mar. 8, 2011) (Sharpe, J.) (finding a delay of approximately one month in performing x-ray did not constitute an inordinate amount of time

sufficient to rise to a level of constitutional significance).

In addition to plaintiff's inability to meet the objective prong of the Eighth Amendment test, the record now before the court fails to reveal evidence from which a reasonable factfinder could conclude that defendant possessed the requisite state of mind to support a claim of deliberate indifference. It is clear from the record now before the court that defendant Dinello did not consider plaintiff's boxer's fracture to be a serious medical need, and that this conclusion resulted in cancellation of the trip to an emergency room on September 4, 2015. Dkt. No. 44-4 at 3. As was previously noted, in his professional opinion defendant Dinello does not regard a boxer's fracture as life threatening or capable of causing death, degeneration or extreme pain, and notes further that such a fracture will not typically affect the functionality of the hand and will normally heal without medical treatment. *Id.* Against this backdrop, plaintiff has offered no evidence to show any malicious intent or improper motivation on the part of the defendant in cancelling his outside trip to an emergency room on September 4, 2015, or in the manner in which treatment was subsequently rendered. As one court has noted, "the failure to treat a fracture properly or to order an x-ray is not actionable absent some evidence of deliberate behavior by the treating physician." *Ravenell*

*v. Van der Steeg*, No. 05-CV-4042, 2007 WL 765716, at *5 (S.D.N.Y. Mar. 14, 2007) (citing cases). Accordingly, the failure to establish the requisite subjective culpable state of mind on the part of defendant Dinello provides another independent basis for dismissing plaintiff's deliberate indifference claims against him.

D.   Personal Involvement

While not entirely clear, it appears that plaintiff's deliberate medical indifference claim also stems from allegations that defendant Dinello failed to provide him with medical attention between September 4, 2015 and September 18, 2015, when plaintiff submitted sick-call requests. Dkt. No. 1 at 8; Dkt. No. 44-6 at 36-37. There is no evidence in the record, however, that defendant Dinello was personally involved in responding to plaintiff's alleged sick-call requests. "Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)). As the Supreme Court has noted, a defendant may only be held accountable for his actions under section 1983. *See Iqbal*, 556 U.S. at 683 ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally

18

protected characteristic."). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.*, No. 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994). Plaintiff has offered no basis from which a reasonable factfinder could conclude that defendant was responsible for failing to arrange for sick-call on the dates plaintiff allegedly placed a request, and defendant has denied being aware of those sick call requests. Dkt. No. 44-4 at 5.

It is possible that plaintiff is asserting this claim against defendant Dinello based upon his status as a supervisor in his capacity as a DOCCS Regional Medical Director. It is well-established, however, that a supervisor cannot be liable under section 1983 solely by virtue of being a supervisor, "and [liability] cannot rest on *respondeat superior*." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. To establish responsibility on the part of a supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly participated in the challenged conduct; (2) after learning of the violation

through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501.

In this case, there is no basis in the record to conclude that any of these alternative grounds for imposing supervisory liability exists in this case. Indeed, to reiterate, defendant has denied any knowledge that plaintiff filed any sick-call requests, Dkt. No. 44-4 at 5, and plaintiff has failed to adduce any evidence that defendant was involved in deciding how those requests would be addressed. Accordingly, to the extent plaintiff's claims are predicated on the failure to provide medical treatment as requested in sick-call slips, his claim against defendant Dinello is subject to dismissal for lack of personal involvement.

IV.    SUMMARY AND RECOMMENDATION

Plaintiff's Eighth Amendment deliberate indifference claims in this action arise from a relatively minor injury suffered during a fight with another inmate and his contention that the injury was not properly diagnosed and treated by prison medical staff. Because the record now before the court fails to contain evidence from which a reasonable factfinder could conclude that plaintiff has met both the objective and subjective requirements necessary to support an Eighth Amendment deliberate indifference claim, and further based on lack of personal involvement on the part of defendant Dinello in connection with failure of prison officials to permit the plaintiff to be seen at sick call, it is hereby respectfully

RECOMMENDED that defendant's motion for summary judgment (Dkt. No. 44) be GRANTED, and that plaintiff's complaint in this action be DISMISSED in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.[6] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

---

[6]    If you are proceeding *pro se* and are served with this report and

APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:    August 7, 2018
          Syracuse, New York

David E. Peebles
U.S. Magistrate Judge

---

recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report and recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

Case 9:16-cv-00541-FJS-DEP    Document 57    Filed 08/07/18    Page 23 of 82
Dawkins v. Whalen, Not Reported in F.Supp.2d (2009)
2009 WL 222975

2009 WL 222975
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jermaine DAWKINS, Plaintiff,

v.

Dr. WHALEN, Head Physician; and Mrs. T.
Downer, Acting Nurse Administrator, Defendants.

No. 9:04–CV–0943(GTS/GJD).
|
Jan. 28, 2009.

**Attorneys and Law Firms**

Jermaine Dawkins, Bradford, PA, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, James Seaman, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

### DECISION and ORDER

Hon. GLENN T. SUDDABY, District Judge.

 *1  Currently before the Court in this *pro se*
prisoner civil rights action are Defendants' motion for
summary judgment (Dkt. No. 61), and the Report–
Recommendation of United States Magistrate Judge
Gustave J. DiBianco that Defendants' motion be granted
(Dkt. No. 65). Plaintiff has not filed any objections to the
Report–Recommendation, despite having been granted
an extension of time in which to do so. (Dkt. No. 67.) For
the reasons set forth below, the Report–Recommendation
is accepted, and Defendants' motion is granted.

## I. BACKGROUND

### A. Plaintiff's Amended Complaint

On August 9, 2004, Plaintiff Jermaine Dawkins
("Plaintiff"), a prison inmate, filed this *pro se* civil rights
action pursuant to 42 U.S.C. § 1983. (Dkt. No. 1.) On
March 6, 2006, he filed an Amended Complaint. (Dkt. No.
33.) Generally, his Amended Complaint alleges that four
employees of Bare Hill Correctional Facility in Malone,
New York ("Bare Hill C.F.") were deliberately indifferent
to his serious medical needs under the Eighth Amendment

between approximately June of 2003 to July of 2004, when
they failed to properly treat an injury he sustained to his
left ring finger. (*Id* .) On March 29, 2007, Plaintiff's claims
against two of these four employees were dismissed, by
Order of Senior District Judge Lawrence E. Kahn. (Dkt.
No. 44.) Remaining in this case were Plaintiff's claims
against Dr. Timothy E. Whalen (a physician) and Terri
Downer (a nurse administrator). (Dkt.Nos.33, 41, 44.)

### B. Defendants' Motion and Magistrate Judge's Report–Recommendation

On February 29, 2008, Defendants moved for summary
judgment with regard the aforementioned remaining
claims. (Dkt. No. 61.) On April 21, 2008, Plaintiff
opposed Defendants' motion (after receiving an extension
of time in which to do so). (Dkt. No. 63.)
On September 18, 2008, Magistrate Judge DiBianco
issued a Report–Recommendation recommending that
Defendants' motion be granted, and that Plaintiff's
Amended Complaint be dismissed in its entirety. (Dkt.
No. 65.) Familiarity with the grounds of Magistrate Judge
DiBianco's Report–Recommendation is assumed in this
Decision and Order. (*Id.*)

On September 25, 2008, Plaintiff requested an extension
of the deadline by which he had to file objections to
Magistrate Judge DiBianco's Report–Recommendation.
(Dkt. No. 67.) On October 2, 2008, the Court granted
Plaintiff's request, extending his response deadline to
January 5, 2009. (*Id.*) Despite receiving this extension,
Plaintiff has not filed any objections to the Report–
Recommendation. (*See generally* Docket Sheet.)

## II. ANALYSIS

### A. Clear–Error Review of Report–Recommendation

For the sake of brevity, the Court will not recite the
well-known legal standard of clear error that governs
the review of a magistrate judge's report-recommendation
to which a party has made no objection, pursuant
to 28 U.S.C. § 636(b)(1)(C). Rather, the Court will
merely refer the parties to its decision in *Vigliotti v.
Daly,* 05–CV–1320, 2008 WL 5423453, at *1 (N.D.N.Y.
Dec. 30, 2008)* (Suddaby, J.), which recites that legal
standard. After carefully reviewing all of the papers in this
action, including Magistrate Judge DiBianco's Report–
Recommendation, the Court concludes that the Report–
Recommendation is not clearly erroneous. (Dkt. No. 65.)

Magistrate Judge DiBianco employed the proper legal
standards, accurately recited the disputed material facts,
and reasonably applied the law to those facts. (*Id.*) As
a result, the Court adopts the Report–Recommendation.
(*Id.*) [1]

**B. Alternative Ground for Dismissal: Failure to Notify
Court of Address**
**\*2** The Second Circuit has identified five factors that it
considers when reviewing a district court's order to dismiss
an action for failure to prosecute (or failure to obey a court
order) under Fed.R.Civ.P. 41(b):

> (1) the duration of the plaintiff's
> failures, (2) whether plaintiff had
> received notice that further delays
> would result in dismissal, (3)
> whether the defendant is likely to
> be prejudiced by further delay,
> (4) whether the district judge has
> taken care to strike the balance
> between alleviating court calendar
> congestion and protecting a party's
> right to due process and a fair chance
> to be heard and (5) whether the judge
> has adequately assessed the efficacy
> of lesser sanctions.

*Hevner v. Village East Towers, Inc.,* No. 07–5608, 2008
WL 4280070, at \*1–2 (2d Cir. Sept. 18, 2008) [citation
omitted].

Here, after carefully weighing these five factors, the
Court concludes that, even if the dismissal of Plaintiff's
Amended Complaint were not warranted for the reasons
stated above in Part II .A. of this Decision and Order,
that dismissal would be warranted as a sanction for
failure to prosecute (or failure to obey a court order)
under Fed.R.Civ.P. 41. On or before October 8, 2008,
Plaintiff was apparently released from custody of the FCI
McKean in Bradford, PA. (*See* Dkt. No. 67 [Letter from
Plaintiff dated 9/25/08 stating he was scheduled to be
released from prison on 12/9/08]; Dkt. No. 68 [Notice that
Order of Court, assigning undersigned as district judge
in this action, was returned as undeliverable on or about
10/8/08].) However, he has failed to notify the Clerk of this
Court of his current address. (*See generally* Docket Sheet.)

Applying the five factors recited above, the Court finds
that the duration of Plaintiff's failure is some four months,
having begun on or about October 8, 2008. Generally,
durations of such time are sufficient to weigh in favor of
dismissal. *See* N.D.N.Y. L.R. 41 .2(a) ("[P]laintiff's failure
to take action for four (4) months shall be presumptive
evidence of lack of prosecution."); *Georgiadis v. First
Boston Corp.,* 167 F.R.D. 24, 25 (S.D.N.Y.1996) (delay of
four months).

Plaintiff clearly received adequate notice that the failure
in question would result in dismissal of his action. On
August 19, 2004, the Court issued an Order directing
Plaintiff to keep the Clerk's Office apprised of his current
address and that a failure to do so would result in
dismissal of the action. (Dkt. No. 3, at 4.) Moreover,
Plaintiff filed change-of-address notices with the Court
on three occasions: February 8, 2005; May 20, 2005;
and January 30, 2006. (Dkt.Nos.6, 17, 31.) Such filings
indicate that Plaintiff was, and is, fully aware of his
obligations under Fed.R.Civ.P. 41(b), and Local Rules
10.1(b)(2) and 41.2(b) of the Local Rules of Practice for
this Court. *See also* U.S. District Court for the N .D.N.Y.
*Pro Se* Handbook, at 43, http:// www.nynd.uscourts.gov/
documents/ProSeHandbook2008.pdf [last visited Jan. 28,
2009]. [2]

**\*3** The prejudice posed to Defendants by Plaintiff's
failure is exacerbated by the age of the case and number
of events giving rise to Plaintiff's claims. Under the
circumstances, a further delay may well affect witnesses'
memories, the ability to locate witnesses (who might
retire from, or be transferred within, the New York State
DOCS), and the preservation of evidence. *See Geordiadis,*
167 F.R.D. at 25 ("The passage of time always threatens
difficulty as memories fade. Given the age of this case,
that problem probably is severe already. The additional
delay that plaintiff has caused here can only make matters
worse.").

Under the circumstances, the need to alleviate congestion
on the Court's docket outweighs Plaintiff's right to receive
a further chance to be heard in this case. Finally, the
Court has carefully considered less drastic sanctions and
has found them to be inadequate under the circumstances,
especially given the fact that any Order issued by the Court
admonishing Plaintiff for his dilatory conduct would
likely never reach him.

For these reasons, in the alternative, the Court dismisses Plaintiff's Amended Complaint as a sanction under Fed.R.Civ.P. 41(b) for failing to notify the Court of his current address.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge DiBianco's Report–Recommendation (Dkt. No. 65) is ***ACCEPTED*** and ***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 61) is ***GRANTED*** in its entirety; and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 33) is ***DISMISSED*** in its entirety.

JERMAINE DAWKINS, Plaintiff,

v.

DR. WHALEN and T. DOWNER, Nurse Administrator, Defendants.

### REPORT–RECOMMENDATION

GUSTAVE J. DI BIANCO, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation by the Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

In this amended civil rights complaint, plaintiff alleges that defendants denied him constitutionally adequate medical care. (Amended Complaint ("AC") at Dkt. No. 33). Plaintiff requests declaratory and substantial monetary relief.

On February 27, 2007, this court recommended that defendants' motion to dismiss be granted as to plaintiff's claims against all defendants in their "official capacity," and granted as to Defendants Registered Nurse Grant and Superintendent Donelli. (Dkt. No. 41). On March 29, 2007, Senior District Judge Lawrence E. Kahn approved and adopted this court's recommendations in their entirety. (Dkt. No. 44). The remaining defendants

are Dr. Whalen and Nurse Administrator ("NA") T. Downer.

Presently before the court is defendants' motion for summary judgment pursuant to FED. R. CIV. P. 56. (Dkt. No. 61). Plaintiff opposes defendants' motion. For the following reasons, the court will recommend that the motion for summary judgment as to the remaining defendants be granted.

### DISCUSSION

**1.** *Summary Judgment*

**\*4** Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986). At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.* A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc .,* 369 U.S. 654, 655 (1962).

**2.** *Facts*

Plaintiff is currently incarcerated at the McKean Federal Correctional Institution in Bradford, Pennsylvania. The circumstances giving rise to this claim occurred at Bare Hill Correctional Facility in Malone, New York beginning in June 2003 through the time of plaintiff's transfer to Arthur Kill Correctional Facility in February 2004. (Ambulatory Health Record [1] ("AHR") at Feb. 13, 2004). Plaintiff has been continuously incarcerated in five different state and federal prisons since his incarceration

2009 WL 222975

at Bare Hill. (Dkt. Nos. 1, 6, 17, 31, and 64; *see also* Plaintiff's Deposition [2] ("Depo.") at 28–30).

On June 13, 2004, plaintiff attempted to open a door in the N1 dorm at Bare Hill Correctional Facility. (Depo. at 33–34). According to plaintiff, he gripped the door knob (Depo. at 33) with his right hand (Depo. at 37), and used his left hand to grip the edge of the door "to assist" in opening the door (Depo. at 39). Plaintiff testified that the door was difficult to open: "... the weight of the door, it was very heavy going into these living quarters. I don't know if it's paint, but sometimes—actually, all the time the door sticks so you really have to use some sort of force ... When you grip that knob or that handle and you pull it, the majority of the time it gets stuck." (Depo. at 38). Plaintiff testified that when he opened the door, he heard a "pop," and then the door closed on plaintiff's left hand. (Depo. at 39–42). Plaintiff stated that the door "nipped the top of my middle finger," but caught his fourth digit between the door and the door jamb. (Depo. at 41–42). Next, "[s]omeone was standing by me and actually seen it and just went and grabbed the door and assisted me in opening the door." (Depo. at 43).

**\*5** Plaintiff testified that he "went right to the officer's station ... [and] was sent to medical." (Depo. at 45). Plaintiff testified

> I went up and I saw Nurse Grant. [3] She filled out an incident report. She looked at my finger. Even though, like I said, it was the size of a ping pong ball and it was bleeding. She gave me a bandaid. She never even cleaned it up. She just gave me a bandaid. Had me sign an incident report saying that my finger was smashed inside the door on N1 dorm at the approximate time and she sent me on my way. I requested to be seen by a physician and she kept stating there was nothing wrong with your finger.

(Depo. at 45).

Plaintiff submitted a page from Officer Nelson's Log Book dated June 13, 2003. An entry at 11:50 a.m. states that plaintiff "stated to me that he closed his finger in the dorm door. he thinks it may be broken. I called the clinic and I talked to Nurse Grant, she said to send him up." (Dkt. No. 63, Exhibit B at 1). Plaintiff also submitted two pages of the Medical Station's Log Book. The log for June 13, 2003 begins in the middle of the page. At 11:30 a.m., the nurse wrote "Count clear." (Dkt. No. 63, Exhibit B at 2). The entry immediately following the 11:30 a.m. entry is labeled "12:15 a.m." *Id.* This appears to be an error and should have been written "12:15 **p.m.**" The 12:15 a.m. entry states "ESC–N1–Dawkins, 98A4957–nurse notified." *Id.* The next entry is labeled "12:30 p.m.," and states "meds called." *Id.*

At approximately 5:40 p.m. the same day, June 13, 2003, plaintiff was involved in an incident that resulted in an Inmate Misbehavior Report. (Dkt. No. 61, Seaman Aff., Exhibit 2). Officer Whitemarsh charged plaintiff with three violations: Threats, Creating a Disturbance, and being "Out of Place." *Id.*

The AHR does not appear to contain any record of a complaint by plaintiff about his finger on June 13, 2003. The AHR does contain an entry on June 13, 2003 that states "[i]nmate viewed in shorts. 0 injuries noted. Denies any injuries at this time. inmate injury report filled out at this time. Inmate able to answer all questions ... no problems." (AHR at June 13, 2003). The June 13, 2003 AHR entry states that the time of the entry was "1756," or 5:56 p.m. An Inmate Injury Report dated June 13, 2003 notes the following in the "Nature of Injury" section: "viewed in shorts 0 injuries noted. Denies any injuries at this time." (Dkt. No. 61, Seaman Affidavit, Exhibit B at 13). According to the Inmate Injury Report, no treatment was provided at that time. *Id.* The Inmate Statement section of the report shows a quote from plaintiff: "Just a stupid dispute." *Id.* At his deposition, plaintiff testified that the dispute was over how the inmates decided what to watch on the common television. (Depo. at 61).

Plaintiff claims that he was in extreme pain and had no movement in his finger. (AC ¶¶ 13–14). Plaintiff states that his finger was still badly swollen when he returned to the facility medical department on June 26, 2003 to seek medical treatment for his finger. (AC ¶¶ 15–16). Plaintiff states that he was examined by a different nurse (unnamed and not a defendant in this action), who looked for, but could not find the incident report that was completed by Nurse Grant. (AC ¶¶ 17–18). On June 26, 2003, the nurse stated

**\*6** inmate states "I slammed my Lt Ring finger in door in dorm on 6/13/03—I signed an accident report for injs." unable to find accident report in chart. splint applied. -Ring finger—swollen ecclymatic, at end of finger above nail bed. unable to straighten fully—MD review—x-ray

(AHR at June 26, 2003(2)).

Just before the June 26, 2003 AHR entry about plaintiff's ring finger, the AHR indicates an earlier visit on the same day. (AHR at June 26, 2003(1)). The nurse for the earlier entry indicated that an "MD review" would be scheduled. *Id.* The nurse wrote that plaintiff was "going to be IPA in transitional services & need[s] to have medical hold lifted before [he] starts program." *Id.*

The AHR shows an entry for June 27, 2003. (AHR at June 27, 2003). It is unclear whether this entry involved an examination of plaintiff or not. The entry states "program called to see if i/m can come off medical idle. I/m may come off lifting >20*l*bs [sic] but permission granted to be a tutor. schedule for MD call out re: L ring finger". *Id.*

In her Declaration in support of the motion for summary judgment, Defendant NA Downer states that Dr. Weissman reviewed plaintiff's chart "[o]n or about July 8 or 9, 2003 ... [Dr. Weissman] ordered [plaintiff] to be seen for an examination of his finger." (Dkt. No. 61, Downer Decl. at ¶ 20). NA Downer states that "at some point in time," she confirmed that plaintiff was scheduled for an appointment with a physician. *Id.* at 21. NA Downer states that the AHR shows that Dr. Weissman reviewed plaintiff's AHR on June 27, 2003 and July 8 or 9, 2003. (AHR at June 26(1) and June 27, 2003). Dr. Weissman's dated notations were made on the bottom line of the first AHR entry on June 26, 2003 and the AHR entry for June 27, 2003. *Id.* In her Declaration, NA Downer explained that because Dr. Weissman "did not designate a particular scheduling category [either time that he reviewed plaintiff's chart], the 'assigned' category applied, meaning that the appointment would be scheduled more than one month from the date of the order." (Dkt. No. 61, Downer Decl. at 17 & 20).

On July 15, 2003, the AHR shows that plaintiff complained about pain in his left knee and a left finger. (AHR at July 15, 2003). The nurse wrote a note stating "scheduled to see MD." *Id.* The AHR shows that plaintiff

next complained to the medical department on September 4, 2003. (AHR at Sept. 4, 2003). Dr. Whalen examined plaintiff on September 4, 2003, and found that there some was soft tissue swelling around the last joint in the finger that prevented plaintiff from fully entending his finger. *Id. See also* Dkt. No. 61, Whalen Decl. at ¶ 9. The AHR shows that x-rays on plaintiff's knees and left ring finger were performed on September 5, 2003. (AHR at Sept. 15, 2003). An x-ray report dated September 5, 2003 stated "film is technically unacceptable due to marked over-exposure and severe processing error. Examination demonstrates moderately displaced dorsal, intra-articular fracture off the base of the distal phalanx. (Dkt. No. 61, Seaman Aff., Exhibit 6 at 12). The AHR indicated that the x-rays had been sent to Alice Hyde Hospital to be read by a radiologist as of September 15, 2003. *Id.;* Dkt. No. 61, Downer Decl. at ¶ 27.

**\*7** The AHR shows that Dr. Whalen received and reviewed plaintiff's x-ray report on September 29, 2003. (AHR at Sept. 29, 2003). The AHR shows that Dr. Whalen noted a "moderately displaced dorsal, intra-articular fracture of the base of the distal phalanx." *Id.* In his Declaration, Dr. Whalen explained that the distal phalanx is the "last bone in the finger from the tip to the DIP joint." (Dkt. No. 61, Whalen Decl. at ¶ 12). Dr. Whalen visited plaintiff on September 30, 2003. (AHR at Sept. 29 and Sept. 30, 2003). The AHR shows that upon examination, Dr. Whalen found that plaintiff was able to flex and extend his finger without difficulty, and noted some tenderness. (AHR at Sept. 30, 2003). In his Declaration, Dr. Whalen stated "[i]t was my opinion at the time, and remains my opinion today, that the joint exhibited relatively good range of motion and that as the residual swelling subsided additional function could be expected to return to the joint. (Dkt. No. 61, Whalen Decl. at ¶ 13). The AHR does not reflect any complaints by plaintiff or treatment by the medical department at Bare Hill Correctional Facility for plaintiff's left ring finger after September 30, 2003. Plaintiff was transferred to Arthur Kill Correctional Facility in February 2004. (AHR at Feb. 10 and Feb. 13, 2004).

The AHR shows that plaintiff communicated with the medical department regarding his left ring finger in June, July and August 2004 at Arthur Kill Correctional Facility. (AHR at June 29, July 12, July 26, July 28, and August 3, 2004). On June 29, 2004, plaintiff complained about "swelling and difficulty flexing finger 4th finger lift hand

—injured same last year while at Barehill CF ..." (AHR at June 29, 2004). In the plan section of that entry, the writer noted "xray left hand then ortho referral." *Id* .

In July 2004, Dr. Scheiner at Staten Island University Hospital reviewed x-rays of plaintiff's left hand. (Dkt. No. 61, Seaman Aff., Exhibit 6 at 11). On July 7, 2004, Dr. Scheiner found "no acute fracture, dislocation or significant joint space abnormality." *Id.* Dr. Scheiner's dictation was not reviewed until July 14, 2004. *Id.* For July 12, 2004, the AHR shows that plaintiff was "requesting to know result of xray of L ring finger done 7/2/04. Report not available." (AHR at July 12, 2004). On July 26, 2004, plaintiff again wanted to know the results of his previous tests, and "c/o L Ring finger pain." (AHR at July 26, 2004). The AHR shows that a doctor reviewed the x-ray report with plaintiff on July 28, 2004: "x ray report reviewed [with] pt—normal. Pt still [complains of] difficulty flexing DP left 4th finger—[complains of] swelling one joint." (AHR at July 28, 2004). The doctor also noted "ORT consult?-hip consent to be referred." *Id.* The AHR shows that on August 3, 2004, plaintiff "continues to c/o pain to L ring finger." (AHR at Aug. 3, 2004). The nurse noted "i/m just wanted continued pain documented." *Id.*

 **\*8** Defendants submit a form titled "NYSDOCS Request & Report of Consultation" dated July 28, 2004. (Dkt. No. 61, Seaman Aff., Exhibit 6 at 14). In the "Reason for consultation" section of the form, the writer noted "Pt c/o swelling & difficulty flexing ring finger of rt hand > 1yr-s/p injury at prior facility—xray done 7/2/04–no–ac–fx, dislocation or significant joint space abnormality ..." *Id.* In the "Consultant Report" section of the form, the writer's handwriting is unclear, but among the readable words are "no surgery necessary" and "no Rx needed."

Plaintiff states that he was examined by an orthopedic specialist in January 2005, and "it was determined that it was too late for any further medical treatment to done on the Plaintiffs' [sic] finger." (AC ¶ 47). Defendants submit another "NYSDOCS Request & Report of Consultation" dated December 29, 2004. (Dkt. No. 61, Seaman Aff., Exhibit 6 at 15). The consultant's signature is dated January 26, 2005. *Id.* This document includes information about plaintiff's back, but does not refer at all to plaintiff's left ring finger. It is unclear whether this orthopedic

specialist is the orthopedic specialist to which plaintiff refers in his Amended Complaint.

In opposition to the motion for summary judgment, plaintiff submits x-rays that he states were taken in January 2008, and a "Radiology Report" dated March 28, 2007. (Dkt. No. 63, "Motion Exhibit # 1" at 1–2, 3). The findings on the Radiology Report were "[p]robable healed 'ball catcher's' or 'mallet' fracture at 4th DIP, healed." (Dkt. No. 63, "Motion Exhibit # 1" at 3).

Plaintiff filled out an Inmate Grievance Complaint on August 6, 2003, and the facility stamped the grievance received on August 8, 2003. (Dkt. No. 61, Seaman Aff., Exhibit 5 at 1). In the "Action requested by inmate," plaintiff wrote "I want to be seen by a doctor's an [sic] X-ray to be taken on my finger. I want treatment on my finger before the condition worsens. I would like to know what happened to my incident report I signed on June 13, 2003 at approx. 12 pm ... In addition, that door in N–1 has broke [sic] times, which has caused many accidents and injuries to others. That door needs to be properly fixed." *Id.* at 10, 12.

An investigation was conducted by an individual "G. Stanley." G. Stanley's August 22, 2003 Investigative Report stated

> [u]pon investigation I was informed by T. Downer, Acting Nurse Administrator, that [plaintiff] is scheduled to be seen by Dr. Whalen, at which time he can address getting treatment for his finger. T. Downer indicated that the accident report is in [plaintiff's] medical file. All staff are required to wear their name tags when on duty.

*Id.* at 3.

The Inmate Grievance Review Committee ("IGRC") partially accepted plaintiff's grievance and

> refer[red] to work control to assure that the door on housing unit N–1 is fixed and in proper working order. Also, recommend appropriate medical treatment be provided as soon as possible. \*Please

note* that the incident report that was provided by the medical department is not proper report for this incident.

**\*9** *Id.* at 2. In her Declaration, NA Downer explained that she was "probably" incorrect when she submitted a June 13, 2003 incident report that was not related to plaintiff's grievance: "I saw that it was dated June 13th and did not know that he claimed to have been involved in an earlier incident on that date. I have since attempted to find a second incident report for June 13, 2003 and have been unable to do so." (Dkt. No. 61, Downer Decl. at ¶ 25). On August 27, 2003, plaintiff checked two of four boxes appearing at the bottom of the IGRC decision: "I agree with the I.G .R.C. response," and "I wish to appeal to the Superintendent."

On September 16, 2003, the Superintendent wrote that plaintiff's grievance "has been investigated to the extent that the grievant has been seen by the facility physician, and an x-ray has been taken. Medical staff are presently awaiting the result of the x-ray report from the radiologist." (Dkt. No. 61, Seaman Aff., Exhibit 5 at 8). Plaintiff states in his Amended Complaint that he appealed the Superintendent's decision to the Central Office Review Committee ("CORC") on September 18, 2003. (AC ¶ 41). The court has not received any papers related to any appeal by plaintiff to the CORC. Defendants do not argue that plaintiff has failed to exhaust his administrative remedies.

**3. *Medical Care***

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is ***objective*** and measures the severity of the deprivation, while the second element is ***subjective*** and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing *inter alia Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

In order to meet the first element of the standard, plaintiff must show that he has a sufficiently serious illness or injury. *Id.* (citing *Hudson v. McMillian,* 503 U.S. 1, 9 (1992). A medical condition has been considered "sufficiently serious" when there is a "condition of urgency," one that may result in death, degeneration, or extreme pain. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). The seriousness of a plaintiff's medical need may also be determined by reference to the effect of denying the particular treatment. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 310 (S.D.N.Y.2001) (citation omitted). Thus, if unnecessary and wanton infliction of pain results from the denial of treatment, or if the denial of treatment causes the inmate to suffer a lifelong handicap or permanent loss, the condition may be considered "sufficiently serious." *Id.* (citing *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000).

**\*10** In order to meet the second element of the standard, plaintiff must demonstrate more than an "inadvertent" or negligent failure to provide adequate medical care. *Id.* (citing *Estelle,* 429 U.S. at 105–106). Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.* In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance,* 143 F .3d at 702). The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)).

Disagreement with prescribed treatment does ***not*** rise to the level of a constitutional claim. *Sonds,* 151 F.Supp.2d at 311. Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id .* (citations omitted). An inmate does ***not*** have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1086). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Thus, disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds,* 151 F.Supp.2d at 312 (citing *Estelle,* 429 U.S. at 107). Even if those medical judgments amount to negligence or

malpractice, malpractice does **not** become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams,* 474 U.S. 327, 332 (1986) (negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

In the "Cause of Action" section of his Amended Complaint, plaintiff includes seven short paragraphs. (AC ¶¶ 49–55). The paragraphs state one constitutional claim against the defendants: that "[d]efendants' deliberate indifference in failing to treat plaintiff's injury constituted cruel and unusual punishment." (AC ¶ 50). Plaintiff testified in his deposition that prior to his incarceration, plaintiff was involved in various aspects of the music industry. (Depo.13, 19–27). Plaintiff's Amended Complaint states that plaintiff is now concerned about his ability to make a living outside of prison because of what he terms a "permanent injury." (AC ¶ 52). Plaintiff claims that the care he received from Dr. Whalen was needlessly delayed and inadequate once performed. (AC ¶¶ 42–46). Plaintiff claims that NA Downer refused to assist plaintiff in obtaining treatment despite her personal knowledge of his injury, and the likelihood that the condition would worsen. (AC ¶¶ 31–37).

 **\*11** Here, plaintiff must show that he has a serious injury to meet the objective element of the deliberate indifference standard. Plaintiff's injury is a fracture to the tip of his ring finger. In *Estelle v. Gamble,* the Supreme Court cited examples of medical conditions that are sufficiently serious to meet the objective element of the standard. *Estelle v. Gamble*[4] , 429 U.S. 94, 104 n. 10 (1976). District courts in the Second Circuit have generally held that a broken finger does not constitute a serious injury. *Magee v. Childs,* 9:04–CV–1089 (GLS/ RFT), 2006 U.S. Dist. LEXIS 14571, \*12–13 (N.D.N.Y. Feb. 27, 2006) (plaintiff's right hand was caught between a wall and the recreation pen door, breaking his right index finger, x-ray two days later showed the finger was broken); *Revenell v. Van Der Steeg,* 05 Civ. 4042(WHP), 2007 U.S. Dist. LEXIS 17868, \* 10–11 (S.D.N.Y. March 14, 2007) (plaintiff dropped 60–pound dumb bell on his hand, doctor attempted to manipulate bone in hand to realign fracture, realignment was unsuccessful, non-surgical treatment continued). *See also, Sonds,* 151 F.Supp.2d at 311;*Rivera v. Johnson,* 95–CV–0845E(H), 1996 U.S. Dist. LEXIS 14192, \*6–\*7 (W.D.N.Y. Sept. 20, 1996); *Henderson v. Doe,* 98 Civ. 5011(WHP), 1999 U.S.

Dist. LEXIS 8672, \*7 (S.D.N.Y. June 10, 1999) (broken finger is not a "sufficiently serious" medical need and that a delay in treatment of a few days did not constitute deliberate indifference).

In this case, plaintiff's injury to the tip of his left ring finger was not a serious injury. Plaintiff did not complain about pain in his finger or ask for treatment for almost two weeks after the incident on June 13, 2003. Though the finger was still swollen two weeks after the injury occurred, it was clear to the nurse that the injury was to the **tip** of the finger ("ecclymatic at end of finger above nail bed"). (AHR at June 26, 2003(2)). The AHR shows that the nurse applied a splint to the finger. *Id.* Dr. Weismann reviewed plaintiff's chart on June 27, 2003 (AHR at June 26, 2003(1)), but it is unclear whether his review included the second entry on June 26, 2003. Dr. Weismann's second review of plaintiff's chart on July 8 or 9, 2003 (AHR at June 27, 2003) also does not indicate whether the review included the entry at July 5, 2003 when plaintiff complained about his finger again. The AHR shows that Dr. Whalen found some swelling when he examined plaintiff on September 4, 2003. (AHR at Sept. 4, 2003). The AHR shows that when Dr. Whalen examined plaintiff on September 30, 2003, he found that plaintiff was able to flex and extend his finger without difficulty, although plaintiff had some tenderness. (AHR at Sept. 30, 2003). Neither the symptoms of, nor the prescribed treatments for this injury indicate a serious medical need. The plaintiff is unable to meet the first, objective, element of the deliberate indifference standard.

With respect to the second, subjective, element of the deliberate indifference standard, the court notes that plaintiff was regularly seen by the medical staff during his brief time at Bare Hill Correctional Facility. It has not been shown that either Nurse Administrator Downer or Dr. Whalen was aware of and disregarded some serious risk to plaintiff. The court also notes that much of plaintiff's claim against the defendants is based on plaintiff's disagreement with the how the timing of his care was determined, and whether or not he required a specialist. As noted above, even if any of these medical judgments amounted to negligence or malpractice, they do not amount to a constitutional violation. *Sonds,* 151 F.Supp.2d at 312 (citing *Estelle,* 429 U.S. at 107).*See also Daniels,* 474 U.S. at 332 (negligence not actionable under Section 1983). Since there is no showing of an intentional or deliberate indifference to a serious medical need, defendants' motion for summary judgment with

Dawkins v. Whalen, Not Reported in F.Supp.2d (2009)

2009 WL 222975

respect to plaintiff's claim of deliberate indifference to a serious medical need should be **GRANTED.**

**\*12 WHEREFORE** it is hereby

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 61) be **GRANTED** and the case **DISMISSED** in its entirety.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 222975

**Footnotes**

1   The Court notes that the Report–Recommendation would survive even *de novo* review.

2   The Court notes that, to assist *pro se* litigants, the Clerk of the Court has provided to all correctional facilities in New York State copies of the Northern District's *Pro Se* Handbook and the Local Rules of Practice for this Court.

1   The Ambulatory Health Record ("AHR") is located in Exhibit 6 of Assistant Attorney General Seaman's Affidavit in support of the summary judgment motion, located at Docket Number 61.

2   Plaintiff's Deposition ("Depo.") is located at Exhibit A of Assistant Attorney General Seaman's Affidavit in support of the summary judgment motion, located at Docket Number 61. Each page of the exhibit has four pages of deposition testimony on it. For instance, page 8 of the exhibit includes deposition testimony pages 26, 27, 28, and 29. The court will use the numbering on the deposition testimony pages instead of the pages of the exhibit.

3   Nurse Grant was a defendant in this action. Senior District Judge Kahn dismissed the claims against her for failure to state a claim. (Dkt. No. 44).

4   *Estelle* cited several instances serious medical needs: *Williams v. Vincent,* 508 F.2d 541 (2d Cir.1974) (doctor's choosing the "easier and less efficacious treatment" of throwing away the prisoner's ear and stitching the stump may be attributable to "deliberate indifference ... rather than an exercise of professional judgment"); *Thomas v. Pate,* 493 F.2d 151, 158 (7th Cir.1974) cert. denied *sub nom. Thomas v. Cannon,* 419 U.S. 879 (1974) (injection of penicillin with knowledge that prisoner was allergic, and refusal of doctor to treat allergic reaction); *Jones v. Lockhart,* 484 F.2d 1192 (8th Cir.1973) (refusal of paramedic to provide treatment); *Martinez v. Mancusi,* 443 F.2d 921 (2d Cir.1970), cert. denied, 401 U.S. 983 (1971) (prison physician refuses to administer the prescribed pain killer and renders leg surgery unsuccessful by requiring prisoner to stand despite contrary instructions of surgeon).

2000 WL 1264122
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Lisa ELGAMIL, Plaintiff,

v.

SYRACUSE UNIVERSITY, Defendant.

No. 99-CV-611 NPMGLS.
|
Aug. 22, 2000.

**Attorneys and Law Firms**

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.


MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.


INTRODUCTION

**\*1** Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681 *et seq.* ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.


LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

> shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts

> by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [1] by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See, e.g., Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317; *Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy, Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL 903629, at \* 1 n. 1 (N.D.N.Y.1998); *Costello v.. Norton,* 1998 WL 743710, at \* 1 n. 2 (N.D.N.Y.1998); *Squair v. O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at \* 1 n. 2 (N.D.N.Y.1998). As in the cases just cited, this court deems as admitted all of the facts asserted in defendant's Statement of Material Facts. The court next recites these undisputed facts.

# BACKGROUND

 **\*2**  Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's comp. exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing grade. In cases where a student was given both a pass and a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions independently of each other, and no indication of the student's identity was provided on the answer. [2] The coordinator, Roopnarine, had no discretion in compiling these grades-he simply applied the pass or fail formula described above in announcing whether a student passed or failed the comp. exams. Only after a student passed all four written exam questions would he or she be permitted to move to the oral defense of those answers.

 **\*3**  Plaintiff completed her required course work and took the comp. exams in October of 1996. Plaintiff passed two of the exams, family theory and specialty, but failed two, child development and research methods. On each of the exams she failed, she had one marginal grade, and one failing grade. Roopnarine, as a member of her committee, authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators;[3] as mentioned, Clawson, not Roopnarine, authored the exam question.

 **\*4** Plaintiff took the third research methods examination in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for

this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

> [t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating.[4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts: 1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

Case 9:16-cv-00541-FJS-DEP    Document 57    Filed 08/07/18    Page 35 of 82

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

### DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P. 56(c)*. When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See *Torres v. Pisano,* 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." *Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see *Norton v. Sam's Club,* 145 F.3d 114, 117-20 (2d Cir.), cert. denied, 525 U.S. 1001 (1998), "or the evidence must

be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer,* 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*
Title IX provides, with certain exceptions not relevant here, that

> [n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action. See *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, ——, 118 S.Ct. 1989, 1994 (1998) (citing *Cannon v. University of Chicago,* 441 U .S. 677 (1979) and *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60 (1992)).

A. Severe or Pervasive
Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment, [5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See *Davis,* 119 S.Ct. at 1675 (citing *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986), a Title VII case). *Accord Kracunas v. Iona College,* 119 F.3d 80, 87 (2d Cir.1997); *Murray v. New York Univ. College of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by *Gebser,* 118 S.Ct. at 1999.

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which

is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs .,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *See id.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional testing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *See Harris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *See id.; Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id. Accord Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See, e.g., Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See, e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. *See Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his

sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *See Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us," ' are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work

environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *see supra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *See Davis,* 119 S.Ct. at 1671; *Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation." Id.* (Emphasis supplied). *Accord Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d] the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *See Reese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murrell v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999).

Elgamil v. Syracuse University, Not Reported in F.Supp.2d (2000)

2000 WL 1264122

There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[7] *See Reese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See Murray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[8] In any event, the adverse action which plaintiff claims to

be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See Murray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v. Ohio State Univ.,* 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[9]

CONCLUSION

**\*10** For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 1264122

Footnotes

1    Amended January 1, 1999.

2    Of course, as mentioned, because one of the evaluators may have written the question, and the question may have been specific to just that one student, one of the two or three evaluators may have known the student's identity regardless of the anonymity of the examination answer.

3    Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence

in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

4      Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

5      In *Gebser,* 118 S.Ct. at 1999, and *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, ——, 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. *See, e.g., Distasio v. Perkin Elmer Corp.,* 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct, and only then consider whether this conduct is actionable. *See, e.g., Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *See id.*

6      Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

7      As mentioned previously, *see supra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

8      As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

9      Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in [plaintiff's] case was inconsistent with these standards.").

---

End of Document                                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:16-cv-00541-FJS-DEP    Document 57    Filed 08/07/18    Page 40 of 82

Hendrickson v. U.S. Atty. Gen., Not Reported in F.Supp. (1994)

1994 WL 23069

1994 WL 23069
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Dale HENDRICKSON, Plaintiff,

v.

UNITED STATES ATTORNEY GENERAL, G.L.
Hershberger, United States Bureau of Prisons, Gary
Morgan, Pamela Ashline, Kenneth Walicki, Hulet
Keith, Otisville Medical Department, Defendants.

No. 91 CIV. 8135.
|
Jan. 24, 1994.

MEMORANDUM AND ORDER

McKENNA, District Judge.

**\*1** On December 4, 1991, pro se plaintiff Dale
Hendrickson ("Plaintiff" or "Hendrickson"), an inmate
then in confinement at the Federal Correctional
Institution in Otisville, New York ("Otisville"), filed this
action for injunctive relief and damages based upon
alleged violations of his rights under the United States
Constitution, Amendments I, IV, V, VI, IX, and XIII,
and upon violations of various laws and/or regulations
governing prison administration. [1] The Complaint named
as defendants G.L. Hershberger ("Hershberger"), the
United States Attorney General ("Attorney General"),
Gary Morgan ("Morgan"), Pamela Ashline ("Ashline"),
Kenneth Walicki ("Walicki"), Hulett Keith ("Keith"), the
Bureau of Prisons ("BOP"), and the Otisville Medical
Department ("OTV Medical Department") (collectively
"Defendants"). Defendants moved for judgment on the
pleadings pursuant to Rule 12(c) of the Federal Rules
of Civil Procedure, or, in the alternative, for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set out below, Defendants'
Rule 12(c) motion is granted.

I.

Defendants move to dismiss Plaintiff's Complaint,
pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure, for failure to state a claim upon which relief
can be granted. Rule 12(c) provides:

> After the pleadings are closed but
> within such time as not to delay
> the trial, any party may move
> for judgment on the pleadings.
> If, on a motion for judgment on
> the pleadings, matters outside the
> pleadings are presented to and
> not excluded by the court, the
> motion shall be treated as one for
> summary judgment and disposed of
> as provided in Rule 56, and all
> parties shall be given reasonable
> opportunity to present all material
> made pertinent to such a motion by
> Rule 56.

Fed.R.Civ.P. 12(c). "[T]he same standards that are
employed for dismissing a complaint for failure to state
a claim under Fed.R.Civ.P. 12(b)(6) are applicable" to a
Rule 12(c) motion to dismiss for failure to state a claim
upon which relief can be granted. *See Ad–Hoc Comm.
of the Baruch Black & Hispanic Alumni Ass'n v. Bernard
M. Baruch College,* 835 F.2d 980, 982 (2d Cir.1987); *see
also Viacom Int'l. Inc. v. Time, Inc.,* 785 F.Supp. 371, 375
n. 11 (S.D.N.Y.1992); 5A Charles Wright and Arthur R.
Miller, *Federal Practice and Procedure* ¶ 1367, at 515–
16 (1990). Thus, the Court must read the Complaint
generously, drawing all reasonable inferences from the
complainant's allegations. *See California Motor Transp. v.
Trucking Unlimited,* 404 U.S. 508, 515 (1972). Moreover,
"consideration is limited to the factual allegations in
[the] amended complaint, which are accepted as true, to
documents attached to the complaint as an exhibit or
incorporated in it by reference, to matters of which judicial
notice may be taken, or to documents either in plaintiff['s]
possession or of which plaintiff[ ] had knowledge and
relied on in bringing suit." *Brass v. American Film
Technologies, Inc.,* 987 F.2d 142 (2d Cir.1993); *accord
Allen v. Westpoint–Pepperell, Inc.,* 945 F.2d 40, 44 (2d
Cir.1991); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949
F.2d 42, 47–48 (2d Cir.1991), *cert. denied,* 112 S.Ct.
1561 (1992); *Frazier v. General Elec. Co.,* 930 F.2d 1004,
1007 (2d Cir.1991). Defendants, therefore, are entitled to
dismissal for failure to state a claim only if the Court finds
beyond a doubt that "plaintiff can prove no set of facts"
to support the claim that plaintiff is entitled to relief. *See
Conley v. Gibson,* 355 U.S. 41, 45–46 (1957).

Hendrickson v. U.S. Atty. Gen., Not Reported in F.Supp. (1994)

1994 WL 23069

Case 9:16-cv-00541-FJS-DEP    Document 57    Filed 08/07/18    Page 41 of 82

**\*2** Because the 3(g) statement and declarations submitted to this Court by Defendants have not been considered and are hereby excluded from the record, the Court renders its judgment on the pleadings pursuant to Rule 12(c).

## II.

Drawing all inferences in favor of the Plaintiff, *Miller v. Polar Molecular Corp.,* 12 F.3d 1170, 1993 WL 527434 (2d Cir.), the facts are as follows.

During Hendrickson's confinement at Otisville, certain video tapes which had been supplied to him by the government were "systematically and maliciously confiscated"; audio tapes and legal materials also were removed from Plaintiff's possession while he was a pre-trial detainee at Otisville. In retaliation for his bringing legal materials into the Otisville compound area, Plaintiff claims, he was placed in administrative detention. Compl. at 1 (presumably ¶ A.)

Hendrickson also claims at various times to have been wrongly isolated from the general prison population based on alleged and allegedly erroneous OTV Medical Department claims that he had tuberculosis. *Id.* ¶ B. During these periods of medical confinement, Hendrickson claims that the "4A unit team" denied him personal visits, his right to send mail, and telephone communications and consultations necessary to his legal representation. *Id.* ¶ C.

Hendrickson claims that as part of his medical confinement he was "subjected to ruthless and inhumane [d]isciplinary action from the D[isciplinary] H [earing] O[fficer]," and was for 15 days placed in administrative detention and for 30 days deprived of commissary, visitation, and phone privileges. *Id.* ¶ D.

Hendrickson further alleges that commissary items that he had in his possession before entering medical confinement were wrongly confiscated from him, and while in such confinement he was assaulted and searched by the "OTV Riot Squad." *Id.* ¶ E. In addition, he claims, commissary receipts, as well as legal documents and other legal materials were confiscated from him. *Id.* ¶ F.

## III.

Defendants argue that Plaintiff fails to state a claim for which relief may be granted. Of course, in considering a pro se pleading, the Court takes into consideration the special circumstances of pro se litigants. As the Second Circuit has often noted, "special solicitude should be afforded pro se litigants generally, when confronted with motions for summary judgment." *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988); *accord, e.g., Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988); *Beacon Enters., Inc. v. Menzies,* 715 F.2d 757, 767 (2d Cir.1983). We apply the same solicitous standard to the instant motion to dismiss.

Plaintiff, however, has failed to present to this Court either a colorable theory of violation of legal duties or facts to support a claim that might be inferred from the pleadings. Even assuming the truth of Plaintiff's allegations, the Court is left without a cognizable claim before it.

**\*3** At the outset, the Court notes that to the extent that the Complaint seeks injunctive relief from conditions of Plaintiff's treatment while at Otisville as a pre-trial detainee, the claim is now moot as Plaintiff has since been transferred to the United States Penitentiary in Lompoc, California following his conviction at trial. Hendrickson's Complaint also fails to the extent that it seeks damages from the United States government or government officials in their official capacity. Because the United States government enjoys sovereign immunity, it can be sued only to the extent it so consents. *United States v. Mitchell,* 445 U.S. 535, 538 (1980) (quoting *U.S. v. Sherwood,* 312 U.S. 584, 586 (1941)). No such immunity has been waived in suits for damages arising from constitutional violations. *Keene Corp. v. United States,* 700 F.2d 836, 845 n. 13 (2d Cir.), *cert. denied,* 464 U.S. 864 (1983). Thus, the only possible redress remaining available to Plaintiff for the harms alleged is a *Bivens* action [2] against government officials in their personal capacities for actions taken under the color of governmental authority.

As Defendants point out, however, Plaintiff has nowhere, other than in the caption of the Complaint, mentioned by name any of the individual named Defendants. Defs.' Mem.Supp.Mot.Dismiss or Summ.Jt. at 2. It is true that Plaintiff did in the body of the Complaint name the "4A

Case 9:16-cv-00541-FJS-DEP   Document 57   Filed 08/07/18   Page 42 of 82

Hendrickson v. U.S. Atty. Gen., Not Reported in F.Supp. (1994)
1994 WL 23069

Unit Team," the "DHO," and the "OTV Riot Squad," but these designations of group actions undifferentiated as to individuals and of official titles unconnected to any individual names do not allege the actionable *individual* behavior necessary to sustain a *Bivens* claim.

In a *Bivens* action, where Defendants are sued in their personal capacities, actionable behavior must be alleged as to individuals. *See, e.g., Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977); *Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987), *cert. denied,* 489 U.S. 1065 (1989). A complaint that fails to make any specific factual allegations of "direct and personal responsibility on the part of any of the named defendants in regard to the loss of any of [plaintiff's] property" must be dismissed. *Lee v. Carlson,* 645 F.Supp. 1430, 1436 (S.D.N.Y.1986).

More importantly, the light in which a pro se complaint may be considered does not burn so brightly as to blind the court as to the rights of defendants who are entitled to have claims against them alleged with sufficient clarity as to make possible a defense. Even in a pro se complaint, claims must "specify in detail the factual basis necessary to enable [defendants] intelligently to prepare their defense ..." *Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977). Otherwise, blameless parties would be subject to damages claims for free-floating innuendo. To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law. Although the Court may make special efforts to understand the underlying claim of a vague, confusing, or poorly crafted pro se complaint that it would not undertake in connection with a claim prepared by legal counsel, it cannot do so to the extent that this would work an injustice to defendants, whose rights also must be protected. A defendant who is alleged to be liable for his actions has a right to have the claims against him spelled out with a basic degree of clarity and particularity. *See supra* at 7. Although some of the harms alleged by Plaintiff might conceivably be of some substance, the Court cannot understand from the documents before it which defendants are alleged to have participated in which allegedly actionable behavior. The Court cannot on such a basis subject a party to potential liability. *See* Defs' Mot. at 9, 10.

*Summary and Order*

**\*4** For the reasons stated, Plaintiff has failed to plead a colorable case. Defendants' motion to dismiss is granted.

**All Citations**

Not Reported in F.Supp., 1994 WL 23069

Footnotes

1   The Complaint states only that "Bureau of Prison institutional Law" was violated; subsequent documents filed by Plaintiff imply the violation of specific prison policies. *See, e.g.,* Letter from Hendrickson to Judge McKenna of 10/13/93 at 2 (citing BOP Policy Statement 1315.3 purportedly concerning prisoner access to legal materials while in administrative detention).

2   *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971).

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 1103045
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Valery LATOUCHE, Plaintiff,

v.

Michael C. TOMPKINS, C.O., Clinton Correctional
Facility; Dean E. Laclair, C.O., Clinton Correctional
Facility; Jeffrey R. Ludwig, C.O ., Clinton
Correctional Facility; Michael B. King, Sgt.,
Clinton Correctional Facility; D. Mason, C.O.,
Clinton Correctional Facility; B. Malark, C.O.,
Clinton Correctional Facility; John Reyell, C.O.,
Clinton Correctional Facility; Bob Fitzgerald, R.N.,
Clinton Correctional Facility; John Doe, C.O. (C.O.
Gallery Officer Company Upper F–6); John Doe,
C.O. (Mess Hall Supervising C.O.), Defendants.

No. 9:09–CV–308 (NAM/RFT).
|
March 23, 2011.

**Attorneys and Law Firms**

Valery LaTouche, Ossining, NY, pro se.

Eric T. Schneiderman, Attorney General for the State
of New York, Krista A. Rock, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

## MEMORANDUM–DECISION AND ORDER

NORMAN A. MORDUE, Chief Judge.

## INTRODUCTION

**\*1** In this *pro se* action under 42 U.S.C. § 1983,
plaintiff, an inmate in the custody of the New York State
Department of Correctional Services ("DOCS"), claims
that defendants violated his Eighth Amendment rights as
a result of a physical altercation. Defendants moved for
summary judgment pursuant to Rule 56 of the Federal
Rules of Civil Procedure (Dkt. No. 46) and plaintiff
opposed the motion. (Dkt. No. 53). The motions were
referred to United States Magistrate Judge Randolph F.

Treece for a Report and Recommendation pursuant to 28
U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).

Magistrate Judge Treece issued a Report and
Recommendation (Dkt. No. 60) recommending that
defendants' motion be granted in part and denied in
part. Specifically, Magistrate Judge Treece recommended
awarding summary judgment dismissing the following:
(1) plaintiff's claims for monetary relief against all
defendants in their official capacity; (2) plaintiff's claims of
medical indifference against defendant Fitzgerald; and (3)
plaintiff's allegations of verbal harassment by defendant
Mason. Magistrate Judge Treece also recommended
denying defendants' motion for summary judgment
on plaintiff's excessive force claims against defendants
Tompkins, LaClair, Mason, Malark and Reyell and
plaintiff's failure to protect claims against defendants
Ludwig and King.

Defendants filed specific objections to portions of the
Report and Recommendation arguing: (1) that the
Magistrate Judge erred in "overlooking" plaintiff's failure
to comply with Local Rule 7.1(a) (3); (2) that the
Magistrate Judge erred when he failed to apply the
*Jeffreys* exception as plaintiff's testimony was incredible
as a matter of law; and (3) plaintiff's excessive force claims
against defendant Reyell are subject to dismissal for lack
of personal involvement. (Dkt. No. 61). Plaintiff does not
object to the Report and Recommendation. (Dkt. No. 62).

In view of defendants' objections, pursuant to 28 U.S.C.
§ 636(b) (1)(c), this Court conducts a *de novo* review of
these issues. The Court reviews the remaining portions of
the Report–Recommendation for clear error or manifest
injustice. *See Brown v. Peters,* 1997 WL 599355, \*2–3
(N.D.N.Y.), *af'd without op., 175 F.3d 1007 (2d Cir.1999);*
*see also Batista v. Walker,* 1995 WL 453299, at \*1
(S.D.N.Y.1995) (when a party makes no objection to a
portion of the report-recommendation, the Court reviews
that portion for clear error or manifest injustice). Failure
to object to any portion of a report and recommendation
waives further judicial review of the matters therein. *See
Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993).

## DISCUSSION

### I. Local Rule 7.1(a)(3)

The submissions of *pro se* litigants are to be liberally construed. *Nealy v. U.S. Surgical Corp.,* 587 F.Supp.2d 579, 583 (S.D.N.Y.2008). However, a *pro se* litigant is not relieved of the duty to meet the requirements necessary to defeat a motion for summary judgment. *Id.* (citing *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003)). Where a plaintiff has failed to respond to a defendant's statement of material facts, the facts as set forth in defendant's Rule 7.1 statement will be accepted as true to the extent that (1) those facts are supported by the evidence in the record, and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. *Littman v. Senkowski,* 2008 WL 420011, at *2 (N.D.N.Y.2008) (citing *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996)). [1]

*2 The record herein contains few undisputed facts. Plaintiff and defendants disagree on many of the events that transpired and provide conflicting accounts of the circumstances surrounding the incident. In support of the motion, defendants properly filed a Statement of Material Facts pursuant to Local Rule 7.1 and notified plaintiff about the consequences of his failure to respond to the motion for summary judgment. Plaintiff does not dispute that he received such notification from defendants. Plaintiff responded with a handwritten "Statement of Facts", without citations to the record, and failed to specifically admit or deny defendants' factual statements as required by Local Rule 7.1. However, plaintiff also annexed a copy of his deposition transcript. In the deposition, upon questioning from defense counsel, plaintiff testified as follows:

Q. ... Have you read the complaint?

A. Yes, ma'am.

Q. So, you are aware of its contents?

A. Yes, ma'am.

Q. Did anyone help you prepare the complaint?

A. No, ma'am.

Q. Are there any statements contained in the complaint that you now wish to change or modify?

A. I'm not sure.

Q. Well, let me ask you this: So, do you adopt this document under oath as true to the best of your knowledge?

A. Yes, ma'am.

Transcript of Plaintiff's Deposition at 13.

A verified complaint may be treated as an affidavit for the purposes of a summary judgment motion and may be considered in determining whether a genuine issue of material fact exists. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (the plaintiff verified his complaint by attesting under penalty of perjury that the statements in the complaint were true to the best of his knowledge). Based upon the aforementioned colloquy, the Court deems plaintiff's complaint to be "verified" and as such, will treat the complaint as an affidavit. *See Torres v. Caron,* 2009 WL 5216956, at *3 (N.D.N.Y.2009). While plaintiff has not formally and technically complied with the requirements of Local Rule 7.1(a)(3), his opposition to defendants' motion contains sworn testimony. In light of his *pro se* status and the preference to resolve disputes on the merits rather than "procedural shortcomings", to the extent that plaintiff's "Statement of Facts" and assertions in the complaint do not contradict his deposition testimony, the Court will consider those facts in the context of the within motion. *See Mack v. U.S.,* 814 F.2d 120, 124 (2d Cir.1987); *see also Liggins v. Parker,* 2007 WL 2815630, at *8 (N.D.N.Y.2007) (citing *Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996)). The Court has reviewed plaintiff's complaint and compared the allegations with the testimony presented at his deposition and adopts Magistrate Judge Treece's summary of the "facts" as presented by both parties. [2]

## II. *Jeffreys* Exception

Defendants argue that the Court should apply *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) and award summary judgment dismissing all claims of excessive force based upon plaintiff's implausible and contradictory claims.

*3 "It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment' ". *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006)

(citing *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997) (unfavorable assessments of a plaintiff's credibility are not "within the province of the court on a motion for summary judgment")). A narrow exception to this general rule was created by the Second Circuit in *Jeffreys:*

> While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account. Under these circumstances, the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor.

*Id.* at 554 (internal citations and citations omitted).

Here, while plaintiff relies exclusively on his own testimony, for *Jeffreys* to apply, the testimony must also be "contradictory and incomplete". In this regard, defendants argue that plaintiff's allegations are contradicted by his prior accounts of the incident. Defendants cite to the record and argue that plaintiff told Fitzgerald that, "I hit the officer first" and that "I was hurt when I was subdued". Moreover, defendants point out that these statements were documented in an Inmate Injury Report executed by plaintiff.

Plaintiff does not deny making the aforementioned statements. However, in his deposition, plaintiff explained those discrepancies and testified:

> Q. —did Nurse Fitzgerald ask you any questions while he was examining you?
>
> A. I think he asked me how am I feeling, how did this happen?
>
> Q. And what did you say?
>
> A. I told him I was nervous and that [sic] whatever officer D. Mason told me to tell him.
>
> Q. What did you say?

> A. I told him I was nervous and whatever officer D. Mason told me to tell him, which was that I got hurt being subdued—
>
> Q. Which was—
>
> A. —and that I started this.
>
> Q. And is that the truth?
>
> A. No.
>
> Q. Why did you tell the nurse that?
>
> A. Because I was being forced to.
>
> Q. Forced to how?
>
> A. By the officers that [sic] was there.
>
> Q. Did you sign a form admitting that you hit the officer first and you were hurt when you were subdued?
>
> A. Yes, ma'am.
>
> Q. Why did you do that?
>
> A. Because the [sic] officer D. Mason kept smacking me for me to do that.

Transcript of Plaintiff's Deposition at 53–54.

**\*4** In the Report and Recommendation, Magistrate Judge Treece concluded that plaintiff's "fear of retribution" was a plausible explanation for the discrepancies in his testimony. This Court agrees and adopts the Magistrate Judge's conclusions. *See Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106, 112– 13 (2d Cir.1998); *see also Cruz v. Church,* 2008 WL 4891165, at \*5 (N.D.N.Y.2008) ("[t]he Court notes that ... it would be have difficulty concluding that [the][p]laintiff's statement of June 5, 2005, and his statement of June 16, 2005, are wholly irreconcilable, given his proffered explanation that he made the statement of June 5, 2005, out of fear of retribution by [the] [d]efendants).

Defendants also argue that plaintiff cannot identify which individuals participated in the attack; that plaintiff's injuries are consistent with the brief use of force as described by defendants to subdue plaintiff; and that plaintiff's version is contradicted by defendants' affidavits. Magistrate Judge Treece found that plaintiff was able

2011 WL 1103045

to identify some individuals involved in the assault which, "stands in stark contrast to the plaintiff in *Jeffreys* who was unable to identify any of the officers involved in the alleged assault". Upon review of the record, as it presently exists, the Court agrees and finds that plaintiff's testimony is not wholly conclusory or entirely inconsistent to warrant application of the *Jeffreys* exception. *See Percinthe v. Julien,* 2009 WL 2223070, at *7 (S.D.N.Y.2009) (the court rejected the defendants' argument that the plaintiff's claims were subject to dismissal for implausibility as his injuries did not reflect the attack that he described and his description of the incident changed over time holding that the plaintiff's testimony, "[did] not reach the level of inconsistency and lack of substantiation that would permit the Court to dismiss on these grounds").

Magistrate Judge Treece provided an extensive summary of the record and applicable law and found that the evidence did not support deviating from the established rule that issues of credibility are not be resolved on summary judgment. On review, the Court agrees with the Magistrate's recommendations and concludes that the *Jeffreys* exception does not apply. Accordingly, the Court accepts and adopts the Report and Recommendation on this issue.

### III. Reyell's Personal Involvement

Defendants argue that the Magistrate Judge erred when he failed to dismiss the complaint against Reyell on the grounds that he was not personally involved in the attack. Defendants claim that the "RRO erroneously cites plaintiff's declaration as stating that 'it was defendant Reyell and another officer who removed the shirt' ". Defendants claim that the declaration and complaint clearly state that, "Officer Rock orchestrated the removal of plaintiff's shirt" .[3] Defendants argue that the assertions in plaintiff's declaration (submitted in response to the motion for summary judgment) and complaint are contradicted by plaintiff's deposition testimony. Defendants claim that plaintiff testified that Reyell tried to cover up the incident by removing the shirt he was wearing.

**\*5** The Court has reviewed plaintiff's complaint, declaration and deposition transcript and finds defendants' summary of plaintiff's assertions to be

inaccurate. In plaintiff's complaint, on page 8, plaintiff alleges:

> Feeling extremely weak the claimant responded with a shake of his head. Once this performance was over with Correctional Officer R. Rock, the individual who held on to the photograph camera and who is responsible for capturing the claimant's injuries [sic] photos pointed to the claimant's bloody [sic] stain kitchen white colored uniform [ ] as co-workers....

> Correctional Officer D. Mason then roughly removed the article of clothing and with the help of on[e] other they discarded the item of clothings [sic].

In Paragraph 22 of plaintiff's declaration, he states:

> Officer Rock, the individual who held the photograph camera and was responsible for capturing the LaTouche injuries pointed to LaTouche [sic] bloody kitchen white colored uniform to his coworker asking them to remove the article of clothing before he take [sic] any pictures. Mason then roughly removed the clothing and with the help of an other [sic] officer they discarded the items of clothing.

In his deposition, plaintiff testified:

Q. What about Defendant Reyell, why are you suing Reyell?

A. Because defendant Reyell, that's the officer that was holding the camera and he tried to cover up the incident.

Q. How so?

A. That's when him and the other officer that was there, when they was searching me, strip searching me they took my shirt and they kept screaming something about let's remove this bloodstained shirt, let's remove this bloodstained shirt, we can't have this for the camera.

* * *

Q. Reyell and another officer took your shirt off?

A. Yes, ma'am.

Q. Do you remember the other officer's name?

A. No, ma'am.

Transcript of Plaintiff's Deposition at 63–64.

Here, the Magistrate Judge stated that any inconsistency or discrepancy [in plaintiff's testimony], "go[es] to the weight ... accorded to plaintiff's testimony". The Court agrees. Any discrepancies or inconsistencies in plaintiff's testimony are for a jury to assess. In the Second Circuit case of *Fischl v. Armitage,* the plaintiff/inmate alleged that he was assaulted in his cell by other inmates. *Fischl,* 128 F.3d at 54. The district court dismissed the plaintiff's complaint as against one defendant based upon "inconsistent statements". *Id.* The Second Circuit vacated the judgment of the district court holding:

> [T]he district court apparently questioned whether there had been an attack on Fischl at all, principally because of inconsistencies in his accounts of the event, his failure to report such an attack to prison workers in the area on that morning, and the failure of those workers to notice any indications that he had been beaten. That skepticism, however, rests on both a negative assessment of Fischl's credibility and the drawing of inferences adverse to Fischl.

**\*6** Likewise, inconsistent statements by Fischl as to, for example, whether it was five, six, or seven inmates who attacked him, and as to what he observed or overheard just prior to the attack, go to Fischl's credibility. While inconsistencies of this sort provide ammunition for cross-examination, and they may ultimately lead a jury to reject his testimony, they are not a proper basis for dismissal of his claim as a matter of law. The jury might well infer, for example, that while Fischl was under siege he was understandably unable to take an accurate census of the number of inmates holding him and kicking him in the face.

*Fischl,* 128 F.3d at 56.

In this matter, without a credibility assessment of plaintiff, the record does not warrant an award of summary judgment. Accordingly, the Court adopts the Magistrate's recommendation and denies summary judgment on this issue.

## CONCLUSION

It is therefore

**ORDERED** that the Report and Recommendation of United States Magistrate Judge Randolph F. Treece (Dkt. No. 60) is adopted; and it is further

**ORDERED** that for the reasons set forth in the Memorandum–Decision and Order herein, defendants' motion for summary judgment is granted in part and denied in part; and it is further

**ORDERED** that the Clerk provide copies of this Order to all parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1103045

Footnotes

1    Local Rule 7.1(a)(3) provides:
        Summary Judgment Motions
        Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. *Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.*
        The moving party shall also advise *pro se* litigants about the consequences of their failure to respond to a motion for summary judgment. See also L.R. 56.2.

2011 WL 1103045

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.*

Local Rule 7.1(a)(3) (emphasis in original).

2    While the Court adopts Magistrate Judge Treece's recitation of defendants' and plaintiff's versions of the facts, the Court does not adopt the reasoning set forth in the Footnote 2 of the Report and Recommendation.

3    Officer Rock is not a defendant herein.

**End of Document**                              © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 681223
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Mitchell MAGEE, Plaintiff,
v.
Nurse CHILDS,[1] Upstate Correctional
Facility, and Ms. A. Tousignant,
Nurse Administrator, Defendants.

No. CIV904CV1089GLSRFT.
|
Feb. 27, 2006.

**Attorneys and Law Firms**

Mitchell Magee, Willard Drug Treatment Campus,
Willard, NY, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General for the State of New
York, The Capitol, Albany, NY, for Defendants.

Charles J. Quackenbush, Assistant Attorney General, of
counsel.

*REPORT RECOMMENDATION and ORDER*

TREECE, Magistrate J.

**\*1** *Pro se* Plaintiff Mitchell Magee brings a cause of
action pursuant to 42 U.S.C. § 1983, alleging deliberate
indifference towards his medical needs in violation of the
Eighth Amendment. Dkt. No. 5, Am. Compl. at ¶ 7.
Defendant Tousignant, Nurse Administrator, brings this
Motion for Judgment on the Pleadings pursuant to FED.
R. CIV. P. 12(c). Dkt. No. 18. Despite being granted
multiple extensions of time, Plaintiff failed to respond
to the Motion for Judgment on the Pleadings.[2] For the
reasons to follow, it is recommended that the Motion for
Judgment on the Pleadings be granted.

### I. FACTS

The following facts were derived from the Amended
Complaint, which must be taken as true per the motion
to dismiss standard. *See infra* Part II.A. On September

15, 2001, Plaintiff was incarcerated at the Upstate
Correctional Facility ("Upstate"). Am. Compl. at ¶ 6. On
that day, Plaintiff's right hand was caught between a wall
and the recreation pen door, thus breaking his right index
finger. *Id.* Plaintiff reported the incident and Nurse Childs
attended to Plaintiff in his cell approximately twenty (20)
minutes after the medical request. *Id.* Magee's hand was
"swollen, discolored, disfigured" and Plaintiff was in pain.
*Id.* When Nurse Childs prompted Plaintiff to move his
fingers, he could not move the index finger; however,
Nurse Childs completed an injury report which stated that
all the fingers could move and that none were broken.
*Id.* After refusing to sign the report, Plaintiff requested to
see a doctor. *Id.* Permission was denied and Plaintiff was
provided with Tylenol. *Id.*

On September 17, 2001, Plaintiff's hand was x-rayed and
the finger was found to be broken. *Id.* Plaintiff requested
to see a doctor but was denied. *Id.* Magee made another
complaint about the pain and again received Tylenol.
Plaintiff then wrote Defendant Tousignant to make a
request that he be taken to an outside hospital. *Id.* Plaintiff
also filed a grievance on the matter. *Id.* Plaintiff was taken
to an outside hospital on or about September 24, 2001. *Id.*

### II. DISCUSSION

#### A. Motion for Judgment on the Pleadings Standard

It is well settled that a motion for judgment on the
pleadings, pursuant to FED. R. CIV. P. 12(c), is "identical
to that of a Rule 12(b)(6) motion for failure to state a
claim." *Patel v. Contemporary Classics of Beverly Hills,*
259 F.3d 123, 126 (2d Cir.2001) (citing *Irish Lesbian &
Gay Org. v. Giuliani,* 143 F.3d 638, 644 (2d Cir.1998) &
*Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994))
(further citations omitted). "Under that test, a court must
accept the allegations contained in the complaint as true,
and draw all reasonable inferences in favor of the non-
movant; it should not dismiss the complaint 'unless it
appears beyond doubt that the plaintiff can prove no set
of facts in support of his claim which would entitle him
to relief." *Sheppard v. Beerman,* 18 F.3d at 150 (quoting
*Ad-Hoc Comm. of Baruch Black and Hispanic Alumni
Ass'n v. Bernard M. Baruch College,* 835 F.2d 980, 982
(2d Cir.1987)); *see also Patel v. Contemporary Classics of
Beverly Hills,* 259 F.3d at 126. The "standard is 'applied
with particular strictness when the plaintiff complains of

a civil rights violation." ' *Irish Lesbian & Gay Org. v. Giuliani,* 143 F.3d at 644 (quoting *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991)).

### B. Personal Involvement

**\*2** The Second Circuit has held that " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." ' *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)). If a plaintiff seeks to bring a § 1983 action for supervisory liability, there needs to be a showing of personal involvement by the supervisor. *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003). " 'Absent some personal involvement by [the supervisory official] in the allegedly unlawful conduct of his subordinates,' he cannot be liable under section 1983." *Id.* at 144-45 (quoting *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987)) (alterations in original). However, liability on the part of the supervisor may exist

> in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Id.* at 145 (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)) (further citations omitted).

Here, Plaintiff does not allege that Defendant Tousignant had any personal involvement in the medical care received. *See* Am. Compl. Plaintiff, instead, claims that Defendant Tousignant is the supervisor for all the nurses and therefore is "ultimately responsible for overseeing complaints against other nurses, and schedules inmate request [sic] to see a physician." *Id.* at ¶ 3. Plaintiff stated he wrote to Tousignant and requested to be

taken to a hospital. *Id.* at ¶ 6. Plaintiff was taken to a hospital within one week of the request. *Id.* Interpreting Plaintiff's allegations as broadly as possible, it would seem that Plaintiff, in essence, is claiming that either Defendant Tousignant failed to remedy a wrong after being informed through a report or that she was grossly negligent in the supervision of her subordinates who committed a violation. Therefore, the personal involvement prerequisite will not bar Plaintiff's section 1983 action.

### C. Eighth Amendment

Plaintiff claims Defendant Tousignant was deliberately indifferent to his medical needs when she failed "to take corrective action after Nurse Childs failed to provide adequate medical treatment." Am. Compl. at ¶ 7.

The Eighth Amendment of the U.S. Constitution prohibits cruel and unusual punishment. Punishment references that which " 'involve[s] the unnecessary and wanton infliction of pain." ' *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173 (1976)). "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to [his] serious medical needs." *Smith v. Carpenter,* 316 F.3d 178, 183 (2d Cir.2003) (internal quotation marks and citations omitted) (alteration in original).

**\*3** Because objective and subjective elements are present, "the objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Id.* at 183-184 (citing *Chance,* 143 F.3d at 702); *see also Estelle v. Gamble,* 429 U.S. 97, 104 (1976); *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). The subjective element " 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." ' *Hathaway v. Coughlin,* 99 F.3d at 553 (2d Cir.1996) (quoting *Farmer v. Brennan,* 511 U.S. 825 (1994)).

This deliberate indifference must be in regards to the "prisoner's serious illness or injury[.]" *Estelle,* 429 U.S. at 105. Additionally, " '[b]ecause society does not expect that

Magee v. Childs, Not Reported in F.Supp.2d (2006)

2006 WL 681223

prisoners will have unqualified access to health care,' a prisoner must first make this threshold showing of serious illness or injury in order to state an Eighth Amendment claim for denial of medical care." *Smith,* 316 F.3d at 184 (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (further citation omitted)). Some factors that determine whether a prisoner's medical condition is serious include: "1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, 2) whether the medical condition significantly affects daily activities, and 3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162-63 (2d Cir.2003) (internal quotation marks and citations omitted) (noting that an inmate is not required to show "that he or she experiences pain that is the limit of human ability to bear, nor [does the Court] require a showing that his or her condition will degenerate into a life threatening one).

The prisoner has to show "more than an inadvertent failure to provide adequate medical care by prison officials to successfully establish Eighth Amendment liability." *Smith,* 316 F.3d at 184 (internal quotation marks and citation omitted). Prison officials act with deliberate indifference "when [they] 'know [ ] of and disregard[ ] an excessive risk to inmate health or safety; the official[s] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." ' *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. at 837). The Eighth Amendment deals with "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract[.]" *Smith,* 316 F.3d at 186 (citations omitted). Moreover, the "severity of the alleged denial of medical care should be analyzed with regard to all relevant facts and circumstances." *Id.* at 187.

**\*4** A prisoner's disagreement with the form of treatment proscribed by medical personnel will not necessary implicate the Eighth Amendment. *Ifill v. Goord et al.,* 2004 WL 1663994, at \*3 (W.D.N.Y. Apr. 8, 2004) (citation omitted). Furthermore,

> disagreements between a prisoner and prison officials over treatment decisions fall short of cruel and unusual punishment. Thus, disagreements over medications,

diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a *section 1983* claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the *Eighth Amendment.*

*Id.* (quoting *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001) (emphasis in original)). [3]

Additionally, the "prison officials and medical personnel have wide discretion in treating prisoners, and *Section 1983* is not designed to permit federal courts to interfere in the ordinary medical practices of state prisons." *Id.* (internal quotation marks and citation omitted) (emphasis in original). In fact, if the medical treatment concerns "the care and safety of patients," then there is a " 'presumption of correctness.' " *Id.* (quoting *Perez v. County of Westchester,* 83 F.Supp.2d 435, 440 (S.D.N.Y.2000)).

Moreover, a delay in medical treatment does not necessarily invoke the Eighth Amendment. The "delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces 'a conscious disregard of a substantial risk of serious harm." ' *Thomas v. Nassau County Corr. Ctr.,* 288 F.Supp.2d 333, 339 (E.D.N.Y.2003) (quoting *Chance,* 143 F.3d at 703). Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, such a classification is reserved "for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a life-threatening and fast degenerating condition for three days; or delayed major surgery for over two years." *Freeman v. Stack,* 2000 WL 1459782, at \*6 (S.D.N.Y. Sept. 29, 2000) (internal quotation marks omitted).

Here, Plaintiff must show that he has a serious injury. Plaintiff's injury is a broken finger. Am. Compl. at ¶ 6. However, many courts have held that a broken finger does not constitute a serious injury as "[a] broken finger, without more, simply does not present a condition of urgency of the type that may produce death, degeneration or extreme pain which correspondingly

merits constitutional protection." *Rivera v. Johnson,* 1996 WL 549336, at *2 (W.D.N.Y. Sept. 20, 1996); *see also Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d at 311 (noting that "[c]ase law holds that the objective prong of the deliberate indifference test is not satisfied ... where a finger is broken"); *Henderson v. Doe,* 1999 WL 378333, at *2 (S.D.N.Y. June 10, 1999) (stating that a broken finger is not a "sufficiently serious" medical need and that a delay in treat of a few days did not constitute deliberate indifference).[4]

**\*5** In this case, despite liberally construing Magee's allegations, the Amended Complaint fails to state a cause of action. Plaintiff has not alleged facts that show that there was a sufficiently serious medical need as required under the Eighth Amendment standard. Even if the Court were to conclude that Plaintiff had alleged a serious injury, Magee has failed to plead facts that would constitute deliberate indifference. Plaintiff has not stated any facts that would prove that Defendant Tousignant knew of and disregarded an excessive risk to Magee's health. Am. Compl. at ¶ 6. Plaintiff injured his finger on September 15, 2001, received an x-ray on September 17, 2001, and was hospitalized on September 24, 2001. This very short delay would not constitute deliberate indifference. *See Freeman v. Stack,* 2000 WL 1459782, at *6. Furthermore, Plaintiff's disagreement in the form of treatment would not invoke the Eighth Amendment. *Ifill v. Goord et. al.,* 2004 WL 1663994, at *3.

Therefore, it is recommended that the Motion for Judgment on the Pleadings be granted.

### D. Nurse Childs

As noted previously, Defendant Childs has not been properly served with process in this action. *See* Dkt. No. 8. Under FED. R. CIV. P. 4(c)(1), the plaintiff is responsible for service of the summons and complaint for each defendant within a specified time period. Specifically, FED. R. CIV. P. 4(m) states that "[i]f service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, then the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time...."[5] Here, due to Plaintiff's failure to take the necessary steps, Defendant

Childs has not been served. In light of the substantial lapse of time within which Plaintiff was notified of his obligation to ensure service is effectuated, this Court would recommend dismissal of the remainder of Plaintiff's Amended Complaint. *See* FED. R. CIV. P. 4(m). Although the Court would normally recommend dismissal of the unserved Defendant without prejudice, based upon Plaintiff's failure to assert cognizable claims, as explained below, against the unserved Defendant, this Court recommends dismissal with prejudice of the entire Amended Complaint.

In accordance with 28 U.S.C. § 1915(e)(2), when a plaintiff proceeds with an action IFP, a court shall dismiss the case at any time "if the court determines that ... the action ... fails to state a claim on which relief may be granted[.]" 28 U.S.C. § 1915(e)(2)(B)(ii). In this Court's estimation, as with the claim against Defendant Childs, Magee fails to state cognizable claims in the remainder of his Amended Complaint.

Plaintiff's allegations against Defendant Childs concerns the medical care received, or not received, at Upstate. Plaintiff claims after his hand was caught and he hurt his right index finger, a report was made to the officer on the unit who then contacted Nurse Childs. Am. Compl. at ¶ 6. Nurse Childs arrived approximately twenty minutes later to examine Plaintiff's hand. Nurse Childs asked Plaintiff to move his fingers and then filled out an injury report that stated that Plaintiff's finger was not broken. *Id.* Plaintiff then asked to see a doctor and was denied but Plaintiff did receive Tylenol. *Id.* It is not clear whether the request to see a doctor was made to Nurse Childs. Then an x-ray was taken two days later. *Id.*

**\*6** As stated previously, "to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to [his] serious medical needs." *Smith v. Carpenter,* 316 F.3d at 183 (internal quotation marks and citations omitted) (alteration in original). "[T]he objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberative indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Id.* at 183-184 (citing *Chance,* 143 F.3d at 702).

The prisoner must demonstrate that the deliberate indifference was in regards to a serious injury or illness.

*Estelle,* 429 U.S. at 105. Once that is established, a plaintiff must show that prison officials acted with deliberate indifference "when [they] 'know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official[s] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference.' " *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. at 837). This would require "something more than mere negligence ... but something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan,* 511 U.S. at 835.

Here, Plaintiff's serious injury claimed is a broken finger. Am. Compl. at ¶ 6. However, it has been held that a broken finger does not constitute a serious injury. *See Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d at 311; *Henderson v. Doe,* 1999 WL 378333, at *2 (S.D.N.Y. June 10, 1999); *Rivera v. Johnson,* 1996 WL 549336, at *2 (W.D.N.Y. Sept. 20, 1996). Thus, Plaintiff has failed to meet the first prong of the Eighth Amendment analysis.

Therefore, this claim should be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) as failing to state a claim for relief.

### III. CONCLUSION

For the reasons stated herein, it is hereby

RECOMMENDED, that Defendant Tousignant's Motion for Judgment on the Pleadings (Dkt. No. 18) be GRANTED; and it is further

RECOMMENDED, that the entire Amended Complaint be DISMISSED in accordance with 28 U.S.C. § 1915(e)(2)(B)(ii); and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.

*FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW, Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), & 6(e).

### All Citations

Not Reported in F.Supp.2d, 2006 WL 681223

---

Footnotes

1    Defendant Nurse Childs has not been served with the Amended Complaint nor appeared in this action. *See* Dkt No. 8.

2    Pursuant to the Local Rules for the Northern District of New York ("Local Rules"),

> "[w]here a properly filed motion is unopposed and the Court determines that the moving party has met is burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers ... shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown."

N.D.N.Y.L.R. 7.1(b)(3).

3    When a prisoner is in essence claiming medical malpractice,
a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omission sufficiently harmful to evidence deliberate indifference to serious medical needs.
*Hathaway v. Coughlin,* 99 F.3d at 553 (quoting *Estelle,* 429 U.S. at 106 & n. 14).
If the malpractice involved "culpable recklessness, i.e., an act or failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of harm,' " then it may constitute deliberate indifference. *Id.* (quoting *Farmer,* 114 S.Ct. at 1980).

---

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 681223

4    All of these cases were analyzed under the motion to dismiss standard pursuant to FED. R. CIV. P. 12(b)(6). The cases are applicable as a motion for judgment on the pleadings is considered under the same standards as the motion to dismiss. *See supra* Part II.A.

5    Furthermore, pursuant to the Local Rules for the Northern District of New York ("Local Rules"), "service of process [is required] upon all defendants within sixty (60) days of the filing of the complaint." N.D.N.Y.L.R. 4.1.

---

**End of Document**                                                © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 1555588

2006 WL 1555588
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Mitchell MAGEE, Petitioner,

v.

Nurse CHILDS, Upstate Correctional Facility, MS
A. Tousignant, Nurse Administrator, Respondent.

No. 9:04-CV-1089(GLS/RFT).
|
June 6, 2006.

**Attorneys and Law Firms**

Mitchell Magee, Willard, NY, Pro Se Plaintiff.

Hon. Eliot J. Spitzer, New York State Attorney General,
Albany, NY, Charles J. Quackenbush, Assistant Attorney
General, for the Defendant.

**ORDER**

GARY L. SHARPE, District Judge.

*\*1* On September 20, 2004, Mitchell Magee filed an *In
Forma Pauperis* (I FP) application and *pro se* complaint
pursuant to 28 U.S.C. § 1983 alleging that the defendants
violated his civil rights. *See Dkt. Nos. 1, 2.* On October
18, Magistrate Judge Randolf F. Treece issued an order
granting Magee's IFP application. [1] *See Dkt. No. 4.* On
November 4, he filed an amended complaint. *See Dkt. No.
5.*

On May 5, 2005, the defendants filed a motion to dismiss.
*See Dkt. No. 18.* On October 19, Magee informed the court
of a change of address. On November 10, Magee again
informed the court of a change of address, listing: Willard
Drug Treatment Campus, Willard, New York. *See Dkt.
No. 27.*

On February 27, 2006, Judge Treece issued a report
recommending that Magee's complaint be dismissed. *See
Dkt. No. 28.* On March 3, the Report-Recommendation
was returned as undeliverable. *See Dkt. No. 29.*
Accordingly, the court issued an order on March 10,
explaining to Magee the obligations of *pro se* plaintiffs

to adhere to the Federal and Local Rules. *See Dkt. No.
30.* The order directed Magee to notify the court of his
current address within fourteen days and warned Magee
that his failure to comply with the order would result in
dismissal for failure to comply with Local Rule 10.1(b) [2]
and 41.2(b). [3] *Id.* On March 20, the order was returned
to this court as undeliverable. *See Dkt. No. 31.* Despite
his knowledge of his obligation to apprise the court of
his current address and the consequences of failing to do
so, Magee has not complied with the court's March 10th
order. *See Dkt. No. 30.*

This court finds that Magee's failure to provide the court
with a change of address warrants dismissal. Rule 41(b)
of the Federal Rules of Civil Procedure allows a court to
dismiss an action for failure to prosecute. *See* FED. R.
CIV. P. 41(b). Courts in the Northern District of New
York have dismissed lawsuits brought by *pro se* plaintiffs
for failure to provide a current address. *See Fenza v.
Conklin,* 177 F.R.D. 126 (N.D.N.Y.1988); *Williams v.
Faulkner,* 95-CV-741, 1998 WL 278288 (N.D.N.Y. May
20, 1998); *Dansby v. Albany County Corr. Facility Staff,*
95-CV-1525, 1996 WL 172699 (N.D.N.Y. April 10, 1996).

Moreover, the court acknowledges that Magee did not
receive Judge Treece's Report-Recommendation, and
therefore did not have the opportunity to file objections.
Nevertheless, the court reviewed the report for clear error,
as articulated in *Almonte v. NYS Div. of Parole,* No.
04-CV-484, 2006 WL 149049, at *5 (N.D.N.Y. Jan. 18,
2006).* Having found no clear error, the court would have
adopted Judge Treece's recommendation. Accordingly,
the complaint is dismissed.

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED,** that Magee's complaint is **DISMISSED** for
failure to notify the court of his current address, for failure
to prosecute, and for failure to comply with this court's
March 10, 2006 order, and it is further

*\*2* **ORDERED** that the Clerk provide a copy of this
Order to Magee at his last known address and close the
case.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1555588

**Magee v. Childs, Not Reported in F.Supp.2d (2006)**

2006 WL 1555588

Footnotes

1    The order states that "plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel of any
     change in Plaintiff's address; his failure to do so will result in dismissal of this action." *See Dkt. No. 4.*

2    Local Rule 10.1(b)(2) provides that "all  ... *pro se* litigants must immediately notify the [c]ourt of any change of address.
     The notice of change of address is to be filed with the [c]lerk of the court and served on all other parties to the action.
     The notice must identify each and every action for which the notice shall apply."

3    Local Rule 41.2(b) provides that "[f]ailure to notify the [c]ourt of a change of address in accordance with L.R. 10.1(b) may
     result in the dismissal of any pending action."

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

---

2010 WL 6001595
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Omar OCASIO, Plaintiff,

v.

F. DELUKE, C.O., Great Meadow Correctional
Facility; P. VanGuilder, Deputy of Security, Great
Meadow Correctional Facility; Richard Roy,
Inspector General; D. Beebe, C.O.; S. Hamel, C.O.;
T. Lespier, Sgt.; C. Murray, Sgt.; R. Armstrong, Lt.;
S. Rowe, Captain; Julie Daniels, Inmate Grievance
Coordinator; M. Harris, Nurse; Richard A. Dunning,
as Administrator of the Estate of Elaine Dunning;
Great Meadow Correctional Facility, Medical
Grievance Department; Lucien LeClaire, Jr.;
Edward Mcsweeny; and Donald Selsky, Defendants.

No. 08–CV–51 (GLS/DRH).
|
Sept. 3, 2010.

**Attorneys and Law Firms**

Omar Ocasio, New York, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, James Seaman, Esq., Adam Silverman,
Esq., Assistant Attorneys General, of Counsel, Albany,
NY, for Defendants.

**REPORT–RECOMMENDATION AND ORDER** [1]

DAVID R. HOMER, United States Magistrate Judge.

**\*1** Plaintiff pro se Omar Ocasio ("Ocasio"), formerly
an inmate in the custody of the New York State
Department of Correctional Services ("DOCS"), brings
this action pursuant to 42 U.S.C. § 1983 alleging
that defendants, fifteen DOCS employees and a facility
grievance department, violated his constitutional rights
under the First, Eighth, and Fourteenth Amendments.
Compl. (Dkt. No. 1). Presently pending is defendants'
motion for summary judgment pursuant to Fed.R.Civ.P.
56. Dkt. No. 129. Ocasio opposes the motion. Dkt. Nos.

135, 148. For the following reasons, it is recommended
that defendants' motion be granted.

### I. Background

The facts are related herein in the light most favorable
to Ocasio as the non-moving party. *See* subsection II(A)
*infra.* The events in question occurred during Ocasio's
incarceration at Great Meadow Correctional Facility
("GMCF").

#### A. Excessive Force

On January 13, 2006, Ocasio was involved in an incident
with defendants Deluke, Beebe, and Maguire. Dkt. No.
128–8 at 7. Deluke and Beebe escorted Ocasio from the
shower to his cell. [2] Dkt. No. 128–8 at 7; Ocasio Dep.
1 (Dkt. No. 129–3, Ex. A) at 24. [3] When he entered his
cell, Ocasio was instructed to place his hands through
a slot in the cell door so that the restraints could be
removed. [4] Dkt. No. 128–8 at 7; Ocasio Dep. 1 at 26–27.
As Deluke was passing the retention strap [5] through the
feed-up slot to Beebe, Ocasio allegedly turned his body
attempting to maintain control of the restraints. Dkt. No.
128–8 at 7. Murray heard Beebe and Deluke "give Ocasio
several orders to release the feed-up port and place his
hands through the port so the restraints could be removed.
Ocasio failed to comply with their orders...." Dkt. No.
129–8 at 12; *see also* Murray Decl. (Dkt. No. 129–8 at
1–5) ¶ 14. Ocasio disputes this fact, contending that he
was completely compliant. Ocasio Dep. 1 at 28–29, 68–
69 (reporting that both defendants repeatedly told him to
"Stop resisting" but that Ocasio maintains that he was
complying with the officers' requests). Beebe maintained
control of Ocasio's right hand and Deluke maintained
control of the left. Dkt. No. 129–8 at 7, 12, 14–15;
Ocasio Dep. 1 at 27–32, 71. According to Ocasio, he faced
forward upon arriving at his cellas required. Ocasio Dep.
1 at 33, 65, 71–75. Non-party Maguire ultimately removed
the restraints, Beebe and Deluke released Ocasio's hands,
Ocasio remained in his cell, and the feed-up slot was closed
without further incident. Dkt. No. 128–8 at 7, 13–15;
Dkt. No. 148 at 22. Video of the event, while poor in
audio quality, indicates that the entire event transpired in
approximately three and a half minutes. Video. As a result
of the incident, Ocasio was issued a misbehavior report

for failing to follow a direct order and exhibiting violent conduct. Dkt. No. 129–8 at 23.

On January 13, 2006, defendant Harris was called to Ocasio's cell at approximately 9:30 a.m. to complete a use of force medical exam. Harris Decl. (Dkt. No. 129–6 at 1–5) ¶ 8; Dkt. No. 129–6 at 12; Dkt. No. 148 at 65. Harris asserts that Ocasio refused the examination. Harris Decl. ¶ 8; Dkt. No. 129–6 at 12; Dkt. No. 129–8 at 8, 10, 12; Dkt. No. 148 at 22, 34; Ocasio Dep. 1 at 114, 116–19. Ocasio informed Harris that she was not allowed into Ocasio's cell, so Murray proposed that Ocasio "stick his] hand out the slot ...." for Harris to perform the medical evaluation...." Ocasio Dep. 2 at 94. Ocasio agreed, but when he insisted that the examination be done professionally, Murray told Harris to to continue on her rounds. *Id.* at 94–95. Non-party Officer Little attempted to take pictures of Ocasio after the incident, but Ocasio refused to comply and turned off the light in his cell. Dkt. No. 129–8 at 12.

**\*2** Ocasio denies ever receiving a medical examination and only receiving medical attention after his fiancee called the IG's office with a complaint of excessive force after visiting Ocasio on January 15. Ocasio Dep. 1 at 84, 116–19. Ocasio claims that the medical staff still did not evaluate him until weeks later. *Id.* at 85. Ocasio claims that the immediate injuries included pain and significant bleeding and that his right arm and wrist had been twisted. *Id.* at 34–37, 39–49, 77–80; Ocasio Dep. 2 at 12–13.

Later that day, defendant Dunning, a nurse, examined Ocasio and noted two complaints, a rash on his forehead and dental pain. Harris Decl. ¶ 9; Dkt. No. 129–6 at 13. The following day, January 14, Ocasio offered no medical complaints. Harris Decl. ¶ 10; Dkt. No. 129–6 at 13; Dkt. No. 148 at 23. On both January 15 and 16, Ocasio complained of vague pain in his forearms, but examination showed no abrasions or swelling. Harris Decl. ¶ 11; Dkt. No. 129–6 at 13–14; Dkt. No. 148 at 23, 64, 66. Ocasio asserts that on January 15, his hand was swollen two to three times its normal size but that he continued to write dozens of grievances. Ocasio Dep. 1 at 101; Ocasio Dep. 2 at 13–15. Ocasio stated that his hand remained swollen and discolored for weeks. Ocasio Dep. 2 at 15–16.

On January 17, 2006, Ocasio was examined by Nurse Lipka to whom he complained of dental pain and

requested to see a dentist and was then seen by Nurse Stevens to whom he reported left arm and right hand pain.[6] Harris Decl. ¶ 13; Dkt. No. 129–6 at 14; Dkt. No. 148 at 64. Ocasio was escorted to Nurse Stevens by non-party Sergeant Hendry, who photographed Ocasio's injuries. Dkt. No. 129–7 at 4; Dkt. No. 148 at 22. Hendry "observed Ocasio dress himself in his cell prior to the escort. Ocasio had no problem putting on his jumpsuit, sneakers, or allowing us to place him in handcuffs and waist chain." Dkt. No. 129–7 at 4. Stevens' examination of Ocasio revealed puffiness and bruising on his right hand and two scratches on his left arm. Harris Decl. ¶ 13; Dkt. No. 129–6 at 14; Dkt. No. 129–8 at 9, 11; Dkt. No. 148 at 33. Stevens found no further injuries and that Ocasio displayed a full range of motion while dressing and undressing for the examination. Dkt. No. 129–8 at 9. Ocasio's subjective complaints included that "his hands were in terrible pain, his arm wouldn't move properly, and he couldn't make a fist with his right hand." Dkt. No. 129–7 at 4. According to Ocasio, Stevens failed both to palpate his hand during the examination, relying on her observations from afar, and record the severity of his injuries. Ocasio Dep. 1 at 110–111, 121, 126–30. According to Ocasio, despite the pain and swelling in his hand, he continued to write grievances to individuals and use his hands to eat, and he still experiences fatigue, pain, and tingling occasionally. Ocasio Dep. 1 at 131–32, 136–38.

Nurse Lipka saw Ocasio on rounds again on January 18, 19 and 20, and during that time Ocasio offered no complaints of pain in his arms or hands. Harris Decl. ¶ 14; Dkt. No. 129–6 at 15; Dkt. No. 148 at 63. On January 19, non-party Ortiz from the Inspector General's ("IG's") Office, received a complaint about the incident on January 13. Ortiz Decl. (Dkt. No. 129–9 at 1–2) ¶ 2. Ortiz conducted an investigation, which included an interview of Ocasio on February 7, 2006. *Id.* ¶ 4; *see also* Dkt. No. 148 at 20, 22 (copy of investigation request and report). Ocasio stated that the use of force constituted Deluke "putting a lot of pressure on [his] hands ..." which caused Ocasio pain, until Maguire arrived and removed his handcuffs. Dkt. No. 129–9 at 4; Dkt. No. 148 at 22. Ocasio added that there was no medical evaluation completed because if things "were not going to be [done] as per [his] request, [he] refuse[d]. [He] wanted in detail [his] medical evaluation." Dkt. No. 129–9 at 5; *see also* Dkt. No. 148 at 22, 27.

**\*3** On January 23 and 24, 2006, Ocasio complained to Dunning about his right hand, requested an x-ray, and she scheduled a doctor's appointment for February 17, 2006. Harris Decl. ¶ 15; Dkt. No. 129–6 at 16; Dkt. No. 148 at 23, 62; Ocasio Dep. 2 at 102–05. On January 26, 2006, Ocasio complained to Lipka of right hand pain and numbness, though she observed no swelling or decreased range of motion. Harris Decl. ¶ 16; Dkt. No. 129–6 at 17; Dkt. No. 148 at 61. Lipka spoke with the physician's assistant about Ocasio's complaints and he agreed to see Ocasio. Harris Decl. ¶ 16; Dkt. No. 129–6 at 17. On January 27, 2006, Ocasio again saw Dunning and complained of right hand pain. Harris Decl. ¶ 17; Dkt. No. 129–6 at 17; Dkt. No. 148 at 61. Dunning told Ocasio that he was scheduled to see a physician on February 17, 2006 and noted that he did not appear to be in any distress. Harris Decl. ¶ 17; Dkt. No. 129–6 at 17; Dkt. No. 148 at 61.

On January 28, 2006, the physician's assistant saw Ocasio and discussed only a restricted diet. Harris Decl. ¶ 18; Dkt. No. 129–6 at 18. Ocasio inquired about x-rays the following day and on February 1. Dkt. No. 148 at 45–46. On February 14, 2006, Ocasio complained of right hand pain to Nurse Nichols and requested an x-ray. Harris Decl. ¶ 19; Dkt. No. 129–6 at 22; Dkt. No. 148 at 56. On February 17, 2006, Ocasio saw a physician who ordered an x-ray of his right hand. Harris Decl. ¶ 20; Dkt. No. 129–6 at 23; Dkt. No. 148 at 55. On February 22, 2006, Ocasio requested another follow-up appointment on his right hand. Dkt. No. 129–6 at 24, Dkt. No. 148 at 54; Ocasio Dep. 2 at 102.

On February 23, 2006, an x-ray was taken and revealed a fracture in Ocasio's third metacarpal which was healing. Harris Decl. ¶ 21; Dkt. No. 1–1 at 6; Dkt. No. 129–6 at 25; Dkt. No. 148 at 53; Ocasio Dep. 1 at 110, 112. Ocasio was instructed to rest and await further instruction during his follow-up appointment in March. Dkt. No. 129–6 at 25. Ocasio was not given a brace or any other assistive device. Ocasio Dep. 2 at 105. On February 28, 2006, Ocasio again inquired as to his hand and was again told to wait until his appointment on March 14, 2006. Dkt. No. 129–6 at 25. Ocasio continued to ask for status reports, but was always reminded to wait until his follow-up in March. Dkt. No. 129–6 at 27–28; Dkt. No. 148 at 50–51, 53.

Ocasio was again seen by medical staff on March 14, 2006. Harris Decl. ¶ 22; Dkt. No. 129–6 at 32; Dkt. No. 148 at 48. The examination "revealed slight tenderness over [the] third metacarpal with no crepitus ... [and] normal range of motion and normal grip strength. The doctor concluded that the fracture was healing." Harris Decl. ¶ 22; Dkt. No. 129–6 at 32; *but see* Ocasio Dep. 1 at 97 (claiming that he never had someone "look at [his] hand specifically, see what was going, see[ ] the function of [his] hand, things like that ... never happened."). Ocasio's hand function was determined to be normal. Dkt. No. 129–6 at 32. Ocasio testified that he presently continues to experience nerve damage in his hand from the use of force. Ocasio Dep. 1 at 102. Ocasio continued to inquire about his x-ray results from medical staff, though the x-rays had already been completed and read to Ocasio and he was told that no further x-rays had been ordered or were needed. Dkt. No. 129–6 at 34, 39–40, 45, 52. Ocasio continued to see the medical department on an almost daily basis throughout 2006. Dkt. No. 129–6 at 34–71.

**\*4** A disciplinary hearing on the misbehavior report issued to Ocasio was held in January 2006. Dkt. No. 148 at 26. On January 26, 2006, the hearing officer determined that certain of Ocasio's witnesses were unnecessary because they lacked personal knowledge of the events of the day in question. Dkt. No. 148 at 24–25. Ocasio claims he was denied a fair and impartial hearing by defendant Armstrong because he was precluded from viewing and introducing the video as evidence. Ocasio Dep. 2 at 81–86. The hearing concluded on January 31, 2006 with a finding of guilt a sentence of nine months in the Special Housing Unit (SHU),[7] loss of privileges, twelve months loss of good time, and seven days of restricted diet. Dkt. No. 148 at 26; Ocasio Dep. 1 at 174–75.

The disciplinary finding and sentence were later reversed. Ocasio Dep. 1 at 173–74; Dkt. No. 129–3 at 306; Ocasio Dep. 2 at 126. However, Ocasio was already confined to SHU for a period of years and his SHU confinement on this charge never commenced. Ocasio Dep. 1 at 176–77. Ocasio did receive a restricted diet as a result of the hearing. *Id.* at 181. While Ocasio was receiving this diet, defendant Hamel prevented medical staff from evaluating Ocacio to ensure that he remained healthy on the restricted diet. Ocasio Dep. 2 at 74, 78–79.

**B. Grievances**

DOCS maintained an Inmate Grievance Program (IGP) for inmates to seek redress over issues of their confinement. "The IGP [Inmate Grievance Program] is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response, and (3) appeal to the CORC [Central Office Review Committee] ... within four working days of receipt of the superintendent's written response." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

"DOCS Directive # 4040 requires that grievance files and logs be maintained for at lest the current year plus the previous four calendar years ... The CORC computer database contains records of all appeals received from the facility Inmate Grievance Program Offices and which were heard and decided by CORC since 1990." Bellamy Decl. (Dkt. No. 129–5 at 1–2) ¶ 6. Ocasio was well aware of the grievance process, correctly reciting the steps required to file a grievance and any appeals thereof. Ocasio Dep. 1 at 123, 143; Ocasio Dep. 2 at 109.

Attached to Ocasio's complaint and filed with his response on this motion are multiple letters filed to multiple individuals both inside and outside DOCS relating to various complaints by Ocasio about his confinement prior to January 13, 2006. Dkt. No. 1–1 at 1–2, 4, 10–11, 13–14; Dkt. No. 1–2 at 1–5, 7, 17–19, 20–21; Dkt. No. 1–3 at 6–11, 13–14, 21; Dkt. No. 148 at 13. In a number of these letters, Ocasio was directed to follow the steps outlined in the facility grievance procedures, or his complaints were forwarded to the Superintendent of the facility in which he was housed, so that the grievance process would be initiated. Dkt. No. 1–1 at 2, 7; Dkt. No. 1–2 at 3, 5. The responses also indicated that Ocasio's grievances which were properly filed were being addressed accordingly and encouraged Ocasio to continue following facility procedures for the most efficient and optimal resolution to his complaints. Dkt. No. 1–2 at 5; Dkt. No. 1–3 at 7–8.

**\*5** In January 2006, Ocasio filed five grievances. Dkt. No. 129–10 at 5. However, of the five filed, none mentioned medical treatment or excessive force. Dkt. No. 129–10 at 5. In March 2006, Ocasio filed a grievance concerning receiving x-rays for his right hand, but did not ever file a grievance charging excessive force by officers. White Decl. (Dkt. No. 129–10 at 1–2) ¶¶ 5–6, 8; Dkt. No.

129–10 at 5; Dkt. No. 129–10 at 7 (grievance seeking x-rays to be taken), 8 (response that x-rays were taken and the results were discussed in March). In 2006, Ocasio only appealed two grievances to CORC which had been filed at GMCF. Bellamy Decl. ¶ 7. Both grievances were filed on November 1, 2006 and pertained to over the counter medications and the grievance process respectively. *Id.* ¶ 7.

The only grievances approaching he matters alleged in this case were one letter to DOCS Deputy Director Nadler and another to Superintendent Greene asserting that Ocasio had been assaulted on January 13 by two officers. [8] Dkt. No. 1–2 at 22, 24. The letters were difficult to read. In the first, Ocasio asked Nadler to forward the letter to the forensic investigation unit, stating that there were witnesses to the assault and subsequent swnial of medical attention. *Id.* at 22. The second letter only identified Deluke as an assailant and that Deluke was being investigated by the DOCS Inspector General. *Id.* at 24. However, this letter never sought to lodge a formal complaint or initiate the grievance process. As the months passed, responses to Ocasio re-emphasized that Ocasio's compliance with the grievance system was imperative and detailed the responses to Ocasio's previously filed grievances. Dkt. No. 1–1 at 3; Dkt. No. 1–2 at 10, 16; Dkt. No. 148 at 30. Additionally, Ocasio continually filed letters to various departments and individuals immediately after the alleged use of force. *See* Dkt. No. 1–1 at 7–9, 12; 1–2 at 22–24 (six letters written by Ocasio in January 2006); Dkt. No. 1–1 at 5, 15; Dkt. No. 1–3 at 1–5 (four letters written by Ocasio in February 2006).

Ocasio testified that he grieved the issues surrounding January 13, 2006 multiple times. Ocasio stated that he filed ten to fifteen complaints per week regarding the excessive use of force, and that he received no responses, so "[n]othing was being exhausted." Ocasio Dep. 1 at 122; *compare* Ocasio Dep. 2 at 121–22 (stating that in the six months subsequent to the alleged incident, he filed 200–25 grievances, averaging approximately fifty pages per week throughout these first few month). These complaints were filed with different agencies and organizations. Ocasio Dep. 1 at 123–24. Ocasio stated that he filed grievances "at least four or five times" regarding the lack of medical treatment that was afforded to him after the use of force incident. *Id.* at 120. Regarding the events of January 13th as a whole, Ocasio could not exhaust his claims "on record because [defendants] did [not] let ... specific grievance [s] ... lead to specifically an exhaustive remedy process...." *Id.*

at 122–23; *see also* Ocasio Dep. 1 at 139–45, 160–62. Ocasio contended that defendants frustrated his right to participate in the grievance process, but failed to proffer any specific examples of grievances filed or the failure of DOCS to review them in the appeals process. Ocasio Dep. 1 at 125–26. During Ocasio's second deposition, he identified Murray as the individual who frustrated his attempt to file grievances by informed Ocasio that "as far as what took place on the 13th, [he] will never be able to exhaust that through the grievance officials while [Murray was t]here." Ocasio Dep. 2 at 39.

 *6  Ocasio also stated that while his grievances were being accepted and presumably mailed, he was also sending copies to Albany to ensure that his complaints were being addressed, but he still failed to receive any responses. Ocasio Dep. 1 at 149–57. Other grievances that he filed were completely exhausted despite Murray's alleged threats. Ocasio Dep. 1 at 157–58; Ocasio Dep. 2 at 40. Ocasio also blamed the limited number of grievances actually taken to completion on defendant Daniel because there were only a portion of those grievances which "she felt ... [were] actually exhaustive through ... the grievance mechanism within the CORC office in Albany...." Ocasio Dep. 2 at 53; *see also* Ocasio Dep. 2 at 55–60.

Ocasio also contends that multiple defendants were included in the present action for failing to respond to complaints which Ocasio had sent them. This included VanGuilder's failure to respond to Ocasio's letters (Ocasio Dep. 2 at 61–66, 123); Roy's failure to respond or initiate investigations into Ocasio's complaints (*id.* at 72–73), Rowe's lack of response to Ocasio's complaints (*id.* at 88); and Leclaire, Selsky, and McSweeny's proclivity to forward the grievances and complaints Ocasio sent to them back to GMCF without conducting their own investigation (*id.* at 107–09, 113–14, 117–19).

## C. Retaliation

Ocasio had previously complained about Deluke and Beebe, resulting in investigations against both of them. Ocasio Dep. 1 at 49–56, 62. Ocasio had Deluke investigated "at least two or three times ... prior to [him] being assaulted ... [for] harassment ... [and] physical infliction." Ocasio Dep. 2 at 19. Deluke was aware of these complaints. Ocasio Dep. 1 at 56–61; Ocasio Dep. 2 at 25–28. Deluke informed Ocasio that he knew the

investigator with whom Ocasio had lodged his complaints and that Deluke had influence over him. Ocasio Dep. 1 at 59; Ocasio Dep. 2 at 26–27. This incident occurred approximately four to six months before the incident forming the basis of the present complaint. Ocasio Dep. 1 at 59–61.

Ocasio also claimed that the video cameras in SHU were not working properly, another element of the alleged retaliation. Ocasio Dep. 2 at 30, 81–82. This claim was reiterated with regard to defendant Armstrong for failing to maintain and provide such tapes to inmates during their disciplinary hearings. *Id.* at 84–85. Additionally, Ocasio claims he was placed on full restraints in retaliation for the events of January 13, 2006. *Id.* at 32–33. Beebe would place the full restraints on very tightly when he escorted Ocasio throughout the facility subsequent to January 13. *Id.* at 35. Furthermore, Ocasio claims that all of the documents produced in the course of reporting the use of force incident, including the summary provided to Armstrong by Murray, was a falsified report meant to conceal the real events that transpired that day. *Id.* at 46–51.

Ocasio also contends that his filings of grievances against Hamel and Lespier ended in retaliatory acts. Ocasio Dep. 2 at 76–80. Ocasio stated that due to the multiple investigations he requested against both defendants, they issued approximately twenty disciplinary charges which caused the amount of time Ocasio was required to remain in SHU to be extended. *Id.* at 76–80.

## III. Discussion

 *7  Ocasio alleges that he was subject to excessive force and to deliberately indifferent medical treatment and that defendants retaliated against him for filing grievances. Liberally construing the complaint, it also appears that Ocasio alleges a due process violation due to a biased disciplinary hearing and disposition resulting from the misbehavior report lodged against him after the use of force. Defendants contend that (1) several defendants should be dismissed for lack of personal involvement, (2) Ocasio has failed to exhaust his administrative remedies with regard to his Eighth Amendment claims, (3) Ocasio's claims are meritless, (4) the Eleventh Amendment bars all claims against Great Meadow, and (5) defendants are entitled to qualified immunity.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Fed.R.Civ.P.* 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks dismissal or summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

### B. Failure to Exhaust

Under 42 U.S.C. § 1997e(a), an inmate must exhaust all administrative remedies prior to bringing any suits challenging prison conditions, including federal civil rights cases. *Porter v.. Nussle,* 534 U.S. 516, 524 (2002); *see also Woodford v. Ngo,* 548 U.S. 81, 83 (2006). This exhaustion requirement applies to all prison condition claims. *Porter,* 534 U.S. at 532. "[A]ny deprivation that does not affect the fact or duration of a prisoner's overall confinement is necessarily a condition of that confinement." *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999). The exhaustion requirement also applies even if the administrative grievance process does not provide for all the relief requested by the inmate. *Nussle,* 534 U.S. at 524.

**\*8** While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004)). Exhaustion for an inmate in DOCS custody is generally achieved through the Inmate Grievance Program (IGP). *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 701.1, *et seq.*. However, when inmates fail to follow the IGP, a court must conduct a three-part inquiry to determine if such failure is fatal to their claims. A court must consider whether

> (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

*Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

Administrative remedies are unavailable when there is no "possibility of [ ] relief for the action complained of." *Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004) (citing *Booth v. Churner,* 532 U.S. 731, 738 (2001)). The test to determine the availability of an administrative remedy is an objective one asking whether "a similarly situated individual of ordinary firmness" would have deemed it accessible. *Id.* at 688.

2010 WL 6001595

The record shows that Ocasio has failed to file any grievances, pursuant to facility policy, regarding his excessive force claims. Dkt. No. 129–15 at 5. Additionally, while Ocasio filed a grievance related to the medical care he received for his hand, he failed fully to exhaust this grievance by appealing it up through CORC. White Decl. ¶¶ 5–6; Dkt No. 129–10 at 5, 7–8; Bellamy Decl. ¶ 7. It is also undisputed that Ocasio was well informed about the grievance process, understood how it worked, and effectively utilized it on multiple occasions both prior and subsequent to the incident on January 13. *See generally* Ocasio Dep. 1 at 123, 143; Ocasio Dep. 2 at 109.

Ocasio contends that despite this knowledge, and despite the fact that he literally filed hundreds of complaints in the months following January 2006, the grievance process was generally unavailable to him as he was frustrated by a single threat by Murray and Daniel's selective processing of his grievances. Ocasio Dep. 1 at 120–26, 139–45, 160–62; Ocasio Dep. 2 at 121–22. These claims are belied by Ocaiso's own actions. Ocasio's testimony indicates that he continued to file dozens of letters of complaint immediately following the use of force and alleged impediments created by DOCS staff. Ocasio Dep. 1 at 122; Ocasio Dep. 2 at 121–22. Accordingly, even construing the facts in the light most favorable to Ocasio, administrative remedies remained available as he continued to file grievances with various individuals in spite of an alleged use of force and threats.

 **\*9** This conclusion is supported by Ocasio's provision to the Court of copies of ten letters that he wrote directly after the use of force and threat. *See* Dkt. No. 1–1 at 7–9, 12; 1–2 at 22–24 (six letters written by Ocasio in January 2006); Dkt. No. 1–1 at 5, 15; Dkt. No. 1–3 at 1–5 (four letters written by Ocasio in February 2006). It is, therefore, undisputed Ocasio continued to lodge numerous complaints, but chose not to fashion the complaints in the form of a facility grievance. Moreover, any arguments that Ocasio's injuries prevented him from filing grievances is also contradicted by his testimony. The record illustrates that, regardless of Ocasio's physical state, he was able to continue file complaints about his conditions of confinement. Ocasio Dep. 1 at 122; Ocasio Dep. 2 at 121–22; Dkt. No. 1–1 at 5, 7–9, 12, 15; 1–2 at 22–24; Dkt. No. 1–3 at 1–5.

The record also establishes without contradiction that Ocasio was well aware of the grievance procedure, and remained engaged in it without pause, prior to and after January 13. Docket No. 129–10 at 4–5 (recording two grievances filed on December 8, 2005, five grievances filed on January 9, 2006, and two grievances filed on March 8, 2006, one of which was the grievance regarding Ocasio's medical care). Ocasio also pursued some grievances through CORC to completion. White Decl. ¶ 7. It appears that, in this instance, Ocasio simply failed to participate and properly utilize the mandatory administrative system. This failure is fatal to Ocasio's claim. *See generally Ruggiero v. County of Orange,* 467 F.3d 170, 177 (2d Cir.2006) (explaining that where there are administrative remedies available, the inmate is "required to exhaust them.") (citations omitted).

Accordingly, defendant's motion should be granted on this ground.[9]

### C. Personal Involvement

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

**\*10** *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).

### 1. VanGuilder and Rowe

Ocasio's principle complaints against VanGuilder and Rowe were that they failed to respond to Ocasio's multiple letters of complaint. Ocasio Dep. 2 at 61–66, 88, 123. However, such contentions are insufficient to establish personal involvement. *See Bodie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004) (citations omitted) (finding personal involvement only where a supervisory official received, reviewed, and responded to a prisoner's complaint); *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose *respondeat superior* liability.") (citations omitted).

Similarly, receipt of a letter, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement. *See, e.g., Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009) (citing cases); *Boddie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004). The complaint also fails to establish any facts that defendants received or responded to complaints or letters. Additionally, the record fails to support any contentions that either defendant was involved with training the individuals involved in these alleged constitutional violations or that either was grossly negligent in performing his employment duties.

Accordingly, defendants' motion should be granted on this ground as to VanGuilder and Rowe.

### 2. Roy

To the extent that Ocasio claims Roy was personally involved as the DOCS Inspector General, such contentions are meritless because a position in a hierarchical chain of command, without more, is insufficient to establish personal involvement. *Wright,* 21 F.3d at 501. Moreover, for the reasons outlined above, Roy was not personally involved merely because Ocasio sent him multiple pieces of correspondence to which he did not reply. Similarly, there is no evidence that Roy received or responded to complaints or letters. Additionally, the record fails to support any contentions that Roy was involved with training the individuals involved in these alleged constitutional violations or that he was grossly negligent in performing his employment duties. Lastly, Ocasio has no constitutional right to an investigation and, therefore, such contentions cannot serve as the basis for § 1983 relief. *See Carrasquillo v. City of New York.,* 324 F.Supp.2d 428, 438 (S.D.N.Y.2004) (holding that prisoners have "no constitutional or federal right to an investigation into ... [an] accident, or to have his requests for an investigation answered").

Accordingly, defendants' motion should be granted on this ground as to Roy.

### 3. LeClaire, Selsky, [10] and McSweeny

**\*11** To the extent that LeClaire, Selsky, or McSweeny are claimed to be personally involved because of their high ranking positions in DOCS, such contentions fail. *Wright,* 21 F.3d at 501. Moreover, for the reasons outlined above, defendants were not personally involved merely because Ocasio claims to have sent them multiple pieces of correspondence to which he did not reply. The complaint fails to establish any facts that defendants received or responded to complaints or letters. Additionally, the record fails to support any contentions that these defendants were involved with training the individuals involved in these alleged constitutional violations or that any was grossly negligent in performing his employment duties. Furthermore, for the reasons outlined above, Ocasio has failed to state a claim when contending that these defendants failed to investigate his claims.

Lastly, to the extent Ocasio has argued that these defendants actions in referring these complaints to the appropriate correctional facility or Superintendents render them personally involved, such contentions are meritless as such delegation is appropriate. *See Bodie,* 342 F.Supp.2d 193, 203 (citations omitted) (finding personal involvement where supervisory official received, reviewed, and responded to an inmate's complaint); *Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989) (holding

that Commissioner of DOCS not personally liable for ignoring plaintiff's letter of protest and request for an investigation).

Accordingly, defendants' motion should be granted on this ground as to LeClair, Selsky, and McSweeny.

### 4. Hamel, Lapier, Armstrong, and Daniel

With respect to each of these four defendants, Ocasio has offered evidence of their direct involvement in his contended constitutional violations. Ocasio stated that Daniel chose to selectively process his grievances, rendering the process unavailable to him. Ocasio Dep. 2 at 53, 55–60. Such contentions establish direct personal involvement in an alleged constitutional violation. Liberally construing Ocasio's complaint, he alleges that Hamel and Lapier promoted his unconstitutional conditions of confinement by prohibiting medical staff from checking on him and ensuring that his restricted diet was not physically harming him. *Id.* at 76–80. Lastly, Ocasio testified as to Armstrong's bias during the disciplinary hearing. *Id.* at 84–85.

Accordingly, defendants' motion on this ground as to Hamel, Lapier, Armstrong, and Daniel should be denied.

### D. Retaliation

Ocasio's complaint alleges that he was subjected to retaliation by Deluke, Beebe, Armstrong, and Murray. To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996); *see also Lipton v. County of Orange,* 315 F.Supp.2d 434, 447–48 (S.D.N.Y.2004) (applying First Amendment retaliation factors to a pretrial detainee complaint). Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 214–15 (N.D.N.Y.2008). Conclusory allegations alone are insufficient. *Id.* at 214 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (explaining that "claim [s] supported by specific and

detailed factual allegations ... ought usually be pursued with full discovery.")).

**\*12** In this case, Ocasio has failed to allege facts sufficient to support a retaliation claim. Ocasio claims that Deluke and Beebe subjected him to excessive force in retaliation for his filing grievances and having investigations commenced against them. Ocasio Dep. 1 at 49–56, 62. While filing grievances and lawsuits are actions protected by the First Amendment, Ocasio has failed to establish that the events of January 13th were precipitated by any specific grievance or investigation. Furthermore, while Ocasio states that Deluke generally attempted to intimate him by telling him that Deluke knew investigators who would believe him over Ocasio, such conversations occurred four to six months prior to the alleged use of force. Ocasio presumably continued to have interactions with both officers during the time he remained, and they continued to patrol, the SHU facility. Therefore, with the passage of so many months Ocasio has failed to state how this continued to be a substantial factor which would motivate any adverse action against him. Accordingly, the requisite "temporal proximity between the [adverse action] ... and the alleged retaliation ...." does not to exist. *Bennett v. Goord,* 343 F.3d 133, 138 (2d Cir.2003) (citations omitted). Moreover, the claims are generally conclusory and unsupported and, thus, must be dismissed. *Jackson,* 713 at 214.

Ocasio also contends that, after the January 13th, Beebe continually placed his restraints on him too tightly in retaliation for the use of force. Ocasio Dep. 2 at 35. Ocasio's actions in response to corrections officers directing him into his cell, whether compliant or not, are not the type of activity protected by the constitution. Thus, even regarding Ocasio's contentions as true, such allegations cannot form the basis of a retaliation claim.

Ocasio further alleges that Armstrong and Murray retaliated against him by falsifying summaries from the use of force reports and prohibiting clear SHU surveillance tapes from being available for use in the disciplinary hearing. Ocasio has failed to state what constitutionally protected activity he engaged in which formed the basis of this claim. Presumably, he alleges that his numerous complaints and grievances were the source of this alleged adverse treatment. However, such claims lack specificity and are conclusory and unsupported.

Thus, they are insufficient to withstand a motion for summary judgment. *Jackson,* 713 at 214.

Accordingly, defendants' motion should be granted as to these claims.

### E. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII.

### 1. Medical Care

This prohibition extends to the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

**\*13** " 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1,9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (citing *Chance,* 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

In this case, Ocasio has failed to establish a serious medical need. A fractured metacarpal has previously been found insufficient to establish the objective prong of the Eighth Amendment analysis. *Ruiz v. Homerighouse,* No. 01–CV–266E(SR), 2003 WL 21382896, at *3 (W.D.N.Y. Feb. 13, 2003) (citations omitted). Such a finding is also consistent with, findings that a broken finger is insufficient to state a serious medical need. *See Magee v. Childs,* No. 94–CV–1089 (GLS/RFT), 2006 WL 681223, at *4 (N.D.N.Y. Feb. 27, 2006) (citing cases). Accordingly, Ocasio has failed to establish the objective prong of the Eighth Amendment assessment.

Moreover, even if a fractured metacarpal was a serious medical need, Harris and Dunning were not deliberately indifferent in treating it. Nurse Harris was initially called to Ocasio's cell after the use of force, but was ordered not to complete the medical examination because Ocasio failed to cooperate. Ocasio Dep. 2 at 94–95. Therefore, it was not Harris' decision to provide or deny treatment.

**\*14** Moreover, the objective medical evidence in the health records supports a conclusion that Ocasio's injury was not serious and did not require any type of care. Despite Ocasio's claims of blood and gore, none of those things were noted in the ambulatory health record, viewed on the SHU videotape, or seen in subsequent photos taken a few days later. The medical records, based upon the accounts of various medical staff indicate that Ocasio vaguely and inconsistently complained of pain and discomfort in his arms. Harris Decl. ¶¶ 10–21; Dkt. No. 129–6 at 13–23. Despite Ocasio's testimony about the pain

2010 WL 6001595

he suffered, his later testimony indicated that he was fully satisfied with his medical treatment. Ocasio Dep. 1 at 88–89, 110–11, 121, 126–38. Furthermore, observations of Ocasio's ability to dress and undress himself days after the use of force also belie claims that medical staff were aware of and deliberately indifferent to his hand. Dkt. No. 129–7 at 4; Dkt. No. 129–8 at 9.

Lastly, Dunning's interactions with Ocasio are far from evident of indifference or delay. Ocasio indicated to Dunning that he had pain in his hand and requested an x-ray. Dunning immediately scheduled Ocasio for a doctor's appointment. Harris Decl. ¶ 15; Ocasio Dep. 2 at 102–05; Dkt. No. 129–6 at 16; Dkt. No. 148 at 23, 62. A doctor's appointment was required to obtain a referral for diagnostic testing and, thus, Dunning immediately did as much as was in her power to provide Ocasio with a diagnosis and relief from his intermittent hand pain. Additionally, from the time that Ocasio requested the x-ray until it was performed, approximately one month passed. This does not constitute an inordinate amount of time for an injury that was not an apparent emergency as Ocasio testified he was still able to write and eat with his hand despite the pain he was feeling.

Accordingly, in the alternative, defendants' motion as to these claims should be granted on this ground.

### 2. Excessive Force

The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain ." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." *Hudson,* 503 U .S. at 9 (internal citations omitted); *Blyden,* 186 F.3d at 262. However, "the malicious use of force to cause harm constitute [s] [an] Eighth Amendment violation *per se"* regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9); *see also Wilkins v. Gaddy,* 130 S.Ct. 1175, 2010 WL 596513 (2010) ("The core judicial inquiry ... was

not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm ."). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de *minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

**\*15** The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant [;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (internal quotation marks and citations omitted).

While a broken metacarpal was not categorized as a serious injury above, a serious injury need not be established in order for an excessive force claim to survive summary judgment. Construing the facts in the light most favorable to Ocasio and that he was compliant with the officers' orders when his handcuffs were being removed, there was no reason to use any force during the removal. Thus crediting Ocasio's testimony, the actions of Deluke and Beebe in restraining Ocasio's shoulder, pulling the retention strap, and grasping his hands appear to have been solely for the purposes of harming Ocasio, which represents a malicious use of force constituting a *per se* Eighth Amendment violation. *Blyden,* 186 F.3d at 263; *see also Wilkins,* 2010 WL 596513. Therefore, construing the facts in the light most favorable to Ocasio, he has established an Eighth Amendment claim against Deluke and Beebe for their malicious and intentional use of force

during the removal of his restraints solely for the purpose of causing Ocasio harm.

Accordingly, defendants' motion as to Deluke and Beebe on this claim should be denied.

### 3. Conditions of Confinement

The Eighth Amendment prohibition against cruel and unusual punishment extends to prison conditions. *Horne v. Coughlin,* 155 F.3d 26, 31 (2d Cir.1998). "The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer,* 511 U.S. at 832. As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test." *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (citations omitted).

The objective prong can be satisfied by

> conditions of confinement ... [which] in combination [constitute an Eighth Amendment violation] when each would not do so alone ... [such as] when the conditions have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets.

**\*16** *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005) (citations omitted). However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.* (*citing Wilson v. Seiter,* 501 U.S. 294, 304–05 (1991)). The subjective prong requires "a prison official [to] have a sufficiently culpable state of mind ..., of deliberate indifference to inmate health or safety" *Farmer,* 511 U.S. at 834 (citations omitted). As to restrictive diets, no constitutional violation will be found unless the "diet was nutritionally inadequate, posed an imminent health risk, or physically injured [the inmate]...." *McEachin v.*

*McGuinnis,* 357 F.3d 197, 199–201 (2d Cir.2004) (citations omitted).

In this case, even liberally construing the complaint and viewing the facts in the light most favorable to Ocasio, he has failed to establish that placement on the restricted diet was a violation of his Eighth Amendment. Nothing in the record supports that the diet was inadequate, posed a health risk, or injured Ocasio. Thus, Ocasio has failed to satisfy the objective prong of the analysis. Furthermore, Ocasio's claims that Hamel and Lespier were deliberately indifferent to his placement on the diet are also meritless. First, as previously stated, the objective prong has not been satisfied. Second, even if the objective prong was satisfied, the record belies Ocasio's claims of deliberate indifference. The health records provided are replete with medical entries of Ocasio continuing to see the medical staff throughout 2006, multiple times per week. Dkt. No. 129–6 at 34–71. Thus, Ocasio's access to medical staff was neither impeded nor delayed.

Accordingly, defendants' motion on this ground should be granted.

### F. Due Process

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. *See Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483–84 (1995). This standard requires a prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life. *Id.* at 484; *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). The fact that an inmate has been disciplined with a segregated confinement alone is insufficient to establish an atypical and significant deprivation. The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" are to be considered. *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998). The Second Circuit has noted that where the period of segregated confinement exceeds thirty days, "refined fact-

finding" is required to resolve defendants' claims under *Sandin. Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000).

**\*17** As Ocasio was never confined in SHU on the disciplinary charge here prior to the reversal on administrative appeal, (Ocasio Dep. 1 at 176–77), there are no questions of fact which exist as to the liberty interest asserted by him. Therefore, Ocasio's liberally construed claim that his procedural due process was violated during his disciplinary hearing is meritless as there has been no established accompanying liberty interest. *See generally Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994) ("[P]rocedural due process questions [are analyzed] in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)).

Accordingly, in the alternative, defendants' motion as to the due process claim should also be granted on this ground. [11]

### G. Eleventh Amendment

While Ocasio's response indicate that he is not suing GMCF in any capacity (Dkt. No. 148 at 3), the complaint names it as a defendant. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41 (1979).

Therefore, Ocasio's claims against GMCF, to the extent that any exist, are expressly barred by the Eleventh Amendment. *See Bryant v. New York State Dep't of Corr. Servs. Albany,* 146 F.Supp.2d 422, 425 (S.D.N.Y.2001) ("State agencies, such as DOCS, serve as an arm of the state and are, similarly, entitled to Eleventh Amendment immunity.") (citations omitted). Thus, the Eleventh Amendment bar applies and serves to prohibit Ocasio's claims against the correctional facility.

Accordingly, it is recommended in the alternative that defendants' motion on this ground be granted as to GMCF.

### H. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 Fed .Appx. 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights ... immunity might still be available as a bar to ... suit if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (citations omitted).

**\*18** A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry need not be reached as to all defendants except Deluke and Beebe because, as discussed *supra,* accepting all of Ocasio's allegations as true, he has not shown that any of these defendants violated his constitutional rights.

However, with respect to Ocasio's claims against Deluke and Beebe for their use or excessive force, the second

prong of the analysis need be considered. There is no question that it was well settled on January 7, 2008 that the Eighth Amendment required that inmates are to be provided "with ... reasonable safety [as i]t is cruel and unusual punishment to hold convicted criminals in unsafe conditions," (*Helling,* 509 U.S. 33 (internal quotation marks and citations omitted)) whether that pertain to their medical care, conditions of confinement, or expectation for protection from corrections staff from dangerous situations. Thus, accepting Ocasio's allegations as true, qualified immunity should be granted to Deluke and Beebe for their allege use of excessive force.

Accordingly, it is recommended in the alternative that defendants' motion on this ground be denied as to Deluke and Beebe and granted as to all other defendants in all other respects.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 129) be **GRANTED** as to all claims and all defendants. Pursuant to 28 U.S .C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72.1(c) (citing 28 U.S .C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2010 WL 6001595

### Footnotes

1   This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2   When traveling throughout the correctional facility, inmates are handcuffed behind their backs pursuant to DOCS policy. Murray Decl. (Dkt. No. 129–8 at 1–5) ¶ 6. The inmate stands in front of his cell gate within reach of a slot in the cell door. *Id.* When the slot is opened, the inmate is ordered to place his hands through the slot and the restraints are applied. *Id.* The inmate then steps forward into the cell, withdrawing his hands from the slot, and the cell gate is opened so that the inmate may back into the hallway. *Id.*

3   Ocasio filed another lawsuit in the Northern District naming certain defendants named herein, concerning an excessive use of force and subsequent deliberate indifference to medical treatment regarding an altercation on January 13, 2006 with Deluke and Beebe. *See Ocasio v. Greene,* No. 08–CV–18 (TJM). The defendants' motion for summary judgment in that case was recently granted for failure to exhaust administrative remedies and a meritless Eighth Amendment claim. *Id.,* Dkt. No. 90. Citations to Ocasio's first deposition are those responses provided in connection with the *Greene* case. In the deposition, Ocasio stated that the difference between the two claims was that the present action is "a retaliatory complaint solely ... being denied [his Fourteenth] and First Amendment rights...." Ocasio Dep. 2 (Dkt. No. 129–3, Ex. B) at 9. However, the bulk of the complaint and related documentation relates to the alleged use of force, and Ocasio still contends that is an issue in the present complaint. Ocasio Dep. 2 at 10.

4   The process for removing restraints once an inmate is returned to his cell is essentially the reverse of that discussed above in note 3. Murray Decl. ¶ 7.

5   A retention strap is a 3# piece of nylon knotted in the center piece of the handcuffs and used to ensure that the officer maintains control of the restraints during the application and removal of the handcuffs and also prevents inmates from retaining the handcuffs and using them as weapons or tools to disable the cell gates. Murray Decl. ¶¶ 8–12. Ocasio is unsure whether he was restrained with a retention strap on the date in question; however, the video clearly displays an officer walking away from the cell after the alleged use of force with a strap in his hands.

6   Contrary to the noted medical entries, Ocasio contends that he knew his hand was fractured immediately and continuously asked medical staff for assistance and diagnostic testing. Ocasio Dep. 1 at 87–88.

7   SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b). Inmates are

confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

8    A third letter apparently addressed to VanGuilder stated Ocasio's intent to have criminal charges filed against Deluke and Beebe for interfering with his religious meals and failing to provide him with the SHU videotape of the use of force incident on January 13. Dkt. No. 1–2 at 23. The remaining correspondence provided by Ocasio dated in 2007, solely pertains to his requests for documents, the appropriate procedure for receiving such documents, and the cost for the documents. Dkt. No. 1–3 at 12, 16–23.

9    While not argued by defendants, the record also shows that Ocasio failed to exhaust his administrative remedies with respect to his retaliation claims. Furthermore, liberally construing the complaint, Ocasio has also failed to exhaust any due process claims or Eighth Amendment claims regarding his placement on, or treatment during, his restricted diet. Accordingly, defendants' motion should be granted for those claims for Ocasio's failure to exhaust those claims as well.

10   Ocasio has included correspondence, and his testimony indicates, that one of his complaints against Selsky dealt with the general quality and reliability of the videotapes produced by the SHU surveillance cameras. There is no further evidence proffered by either party about these issues though, and it is undisputed that Ocasio received the SHU videotape from January 13 for use in the instant litigation. Therefore, this matter will not be further addressed.

11   It is unclear from Ocasio's testimony whether or not he lost any good time credits as a result of his SHU disposition and subsequent reversal. Ocasio Dep. 1 at 178–80. It appears that the credit was restored. However, even if it was not, this is the incorrect vehicle in which to request relief. Any claims for the loss of *"already-earned* good time credit as a result of [the disciplinary disposition, should be addressed pursuant to a writ of habeas corpus as it i]s a prisoner's sole recourse in challenging the procedures used to deny him good-time credits." *Fifield v. Eaton,* 669 F.Supp.2d 294, 297 (W.D.N.Y.2009) (citations omitted) (emphasis in original).

---

End of Document                                          © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 864898
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Omar OCASIO, Plaintiff,

v.

F. DELUKE, C.O., Great Meadow Correctional
Facility; P. Vanguilder, Deputy of Security, Great
Meadow Correctional Facility; Richard Roy,
Inspector General; D. Beebe, C.O; S. Hamel, C.O.;
T. Lespier, Sgt.; C. Murry, Sgt.; R. Armstrong, Lt.;
S. Rowe, Captain; Julie Daniels, Inmate Grievance
Coordinator; M. Harris, Nurse; Richard A. Dunning,
as Administrator of the Estate of Elaine Dunning;
Great Meadow Correctional Facility, Medical
Grievance Department; Lucien Leclaire, Jr.; Edward
McSweeney; and Donald Selsky, Defendants.

No. 9:08–cv–51 (GLS/DRH).
|
March 8, 2011.

**Attorneys and Law Firms**

Omar Ocasio, New York, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney
General, James Seaman, Adam Silverman, Assistant
Attorneys General, of Counsel, Albany, NY, for the
Defendants.

### *MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, District Judge.

 **\*1** Pro se plaintiff Omar Ocasio, a former inmate at
Great Meadow Correctional Facility, brings this action
under 42 U.S.C. § 1983, alleging violations of his First,
Eighth, and Fourteenth Amendment rights. (*See* Compl.,
Dkt. No. 1.) On September 1, 2009, defendants moved
for summary judgment on Ocasio's claims. (Dkt. No.
129.) In a Report–Recommendation and Order (R &
R) filed September 3, 2010, Magistrate Judge David R.
Homer recommended that defendants' motion be granted

and that Ocasio's claims be dismissed. [1] (Dkt. No. 158.)
Pending are Ocasio's objections to the R & R. (Dkt. No.
162.) For the reasons that follow, the R & R is adopted
in its entirety.

Before entering final judgment, this court routinely
reviews all report and recommendation orders in cases it
has referred to a magistrate judge. If a party has objected
to specific elements of the magistrate judge's findings and
recommendations, this court reviews those findings and
recommendations de novo. *See Almonte v. N.Y. State
Div. of Parole,* No. 04–cv–484, 2006 WL 149049, at \*6–
7 (N.D.N.Y. Jan. 18, 2006). In those cases where no
party has filed an objection, or only a vague or general
objection has been filed, this court reviews the findings and
recommendations of a magistrate judge for clear error. *See
id.*

Without specifying the legal or factual basis for his
objections, Ocasio generally objects to Judge Homer's R
& R. (*See* Objections at 2–4, Dkt. No. 162.) In light
of Ocasio's nonspecific and vague objections, the court
has reviewed the R & R for clear error and finds none.
Accordingly, the court adopts Judge Homer's findings
and recommendations and grants defendants' motion for
summary judgment on Ocasio's claims.

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge David R. Homer's
Report–Recommendation and Order (Dkt. No. 158) is
**ADOPTED** and defendants' summary judgment motion
(Dkt. No. 129) is **GRANTED;** and it is further

**ORDERED** that Ocasio's complaint is **DISMISSED** in its
entirety; and it is further

**ORDERED** that the Clerk close this case and provide
a copy of this Memorandum–Decision and Order to the
parties by regular and certified mail.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 864898

Footnotes

2011 WL 864898

1    The Clerk is directed to append the R & R to this decision, and familiarity therewith is presumed.

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Allen v. New York City Dept. of Correction, S.D.N.Y., March 17, 2010

2007 WL 765716
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Preston J. RAVENELL, Jr., Plaintiff,
v.
John VAN DER STEEG et al., Defendants.

No. 05 CIV 4042 WHP.
|
March 14, 2007.

**Attorneys and Law Firms**

Preston J. Ravenell Jr., Green Haven Correctional Facility, Stormville, NY, Plaintiff pro se.

Jonathan S. Saul, Assistant Attorney General, State of New York, New York, NY, for Defendants.

*MEMORANDUM AND ORDER*

PAULEY, J.

**\*1** Plaintiff *pro se* Preston Ravenell, Jr. ("Plaintiff" or "Ravenell") brings this action against Dr. John van der Steeg ("van der Steeg") and Dr. Lawrence Foster ("Foster") (collectively, the "Defendants") pursuant to 42 U.S.C. § 1983, claiming deprivation of medical treatment in violation of the Eighth Amendment. Defendants move for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons set forth below, Defendants' motion is granted.

*BACKGROUND*

Plaintiff is incarcerated at Green Haven Correctional Facility ("Green Haven"). On July 30, 2004, he dropped a 60-pound dumb bell on his hand. (Affidavit of Preston Ravenell, Jr., dated Apr. 11, 2006 ("Ravenell Aff.") ¶ 5.) After being diagnosed with a broken right index finger at the Green Haven medical clinic, Plaintiff was sent to Putnam Hospital Center ("Putnam Hospital") for further

evaluation. (Ravenell Aff. ¶ 5; Defendants' Rule 56.1 Statement, dated Mar. 2, 2006 ("Def. 56.1 Stmt.") ¶¶ 11-15.)

Van der Steeg, the attending emergency department physician at Putnam Hospital, met with Plaintiff and examined x-rays of the fracture. (Ravenell Aff. ¶¶ 6-8; Def. 56.1 Stmt. ¶¶ 16-17.) Van der Steeg then consulted with Dr. Jeffrey Passick ("Passick"), the orthopedic surgeon on duty. (Def. 56.1 Stmt. ¶ 21.) Passick determined that Ravenell required a "closed reduction," which is a procedure for setting a broken bone without making an incision in the skin. (Def. 56.1 Stmt. ¶ 24.) Plaintiff equivocates as to whether the closed reduction was ever performed. In his memorandum opposing summary judgment, Ravenell states that "throughout the entire examination Dr. Steeg[ ] never attempted to manipulate the fracture back into its normal position." (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, dated Apr. 11, 2006 ("Pl.Mem.") at 2-3.) However, in the affidavit he submits in opposition to the instant motion, Ravenell claims that "[w]ithout incision, Dr. Steeg began manipulating the broken bone of my hand in an attempt to realign the fractured metacarpal bone of my right index finger." (Ravenell Aff. ¶ 9.) Defendants, citing Ravenell's medical records, contend that Passick performed the closed reduction after making his recommendation. (Declaration of Dr. John Van der Steeg, dated Mar. 7, 2006 ("Van der Steeg Decl.") ¶ 8; Declaration of Jonathan Saul, dated Mar. 7, 2006 ("Saul Decl .") Exs. E, F.) Additionally, the parties dispute whether Plaintiff's hand was x-rayed after the purported closed reduction to ensure that the reduction was successful. (Ravenell Aff. ¶ 10; Reply Declaration of Dr. John van der Steeg, dated Dec. 20, 2006 ¶ 9.) Van der Steeg recommended that Ravenell follow up with an orthopedist in 5-7 days and prescribed him 600mg of ibuprofen. (Def. 56.1 Stmt. ¶ 26; Van der Steeg Decl. ¶ 11.)

Ravenell's finger was x-rayed again on August 6, 2004, revealing that the position of the fracture had not changed. (Ravenell Aff. ¶ 12; Def. 56.1 Stmt. ¶ 28.) According to his medical records, Ravenell's finger exhibited "pronounced swelling, moderate deformity, pain, limited range of motion of hand and fingers, diminished grip, etc." (Def. 56.1 Stmt. ¶ 27.) On August 20, 2004, Plaintiff consulted with Foster, an orthopedic surgeon. (Ravenell Aff. ¶ 13; Declaration of Dr. Lawrence Foster, dated Mar. 7, 2006

("Foster Decl.") ¶ 4.) Foster noted a non-tender bony prominence and a mild rotational deformity in the broken finger, as well as stiffness in Plaintiff's hand. (Ravenell Aff. ¶¶ 14-16; Foster Decl. ¶ 5; Saul Decl. Ex. J.) Foster recommended biweekly occupational therapy, but noted the possible need for surgery should the therapy fail to achieve satisfactory results. (Ravenell Aff. ¶ 16; Def. 56.1 Stmt. ¶¶ 33-34; Saul Decl. Ex. J.)

**\*2** Plaintiff visited Foster on September 24, 2004 for a clinical recheck. (Ravenell Aff. ¶ 18; Def. 56.1 Stmt. ¶ 35.) While Plaintiff's range of motion had improved in the joints at the tip and middle of his finger, there was still stiffness at the joint close to the knuckle. (Def. 56.1 Stmt. ¶¶ 37-38.) Foster recommended continued occupational therapy with a follow up evaluation two months later. (Ravenell Aff. ¶ 19; Def. 56.1 Stmt. ¶ 40.)

Plaintiff visited Foster for the last time on October 26, 2004, approximately one month earlier than Foster had initially recommended. (Ravenell Aff. ¶ 21; Def. 56.1 Stmt. ¶ 42.) Although Plaintiff still complained of pain and tenderness in his hand, Plaintiff's strength and range of motion "seem[ed] to be clinically improving," and Foster recommended continued non-surgical treatment. (Ravenell Aff. ¶¶ 20, 22; Foster Decl. ¶ 9; Def. 56.1 Stmt. ¶¶ 43, 48-49.) Plaintiff requested a second opinion, and Foster referred him to Dr. Richard Magill ("Magill"), another orthopedic surgeon. (Ravenell Aff. ¶ 22; Def. 56.1 Stmt. ¶¶ 50, 52; Saul Decl. Ex. M.) On November 18, 2004, Magill recommended surgery for Plaintiff's finger. (Ravenell Aff. ¶ 26; Def. 56.1 Stmt. ¶ 53.) McGill performed the operation on December 22, 2004. (Ravenell Aff. ¶ 27; Def. 56.1 Stmt. ¶ 54.)

Defendants move for summary judgment on the grounds that Plaintiff has failed to establish an Eighth Amendment violation and that they are shielded from liability under the doctrine of qualified immunity.

*DISCUSSION*

I. *Summary Judgment Standard*
Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). The materiality of disputed facts is determined by the governing substantive law. *Dister v. Cont'l Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988). Material facts are those that "affect the outcome of the suit under the governing law [while] an issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Shade v. Hous. Auth. of New Haven,* 251 F.3d 307, 314 (2d Cir.2001). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970); *Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 559 (2d Cir.1997). In determining whether there is a genuine issue as to any material fact, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Liberty Lobby,* 477 U.S. at 255.

**\*3** If the moving party meets its initial burden, the non-moving party must then come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c); *Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 133 (2d Cir.2000). The non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient." *Liberty Lobby,* 477 U.S. at 248. Instead, the non-movant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Liberty Lobby,* 477 U.S. at 256. Where it is apparent that no rational finder of fact "could find in favor of the non-moving party because the evidence to support its case is so slight," summary judgment should be granted. *Gallo v. Prudential Residential Servs., Ltd.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The same standards apply when a *pro se* litigant is involved, but such a litigant is afforded wide latitude, and his submissions are held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520 (1972); *see also McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (courts must "read the pleadings of a pro se plaintiff liberally and

interpret them 'to raise the strongest arguments that they suggest' ") (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)).

## II. *Deliberate Indifference Standard*

"[T]o establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs." ' *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104 (1976) (alteration in original)); *accord Farmer v. Brennan,* 511 U.S. 825, 834 (1994). "The standard of deliberate indifference includes both subjective and objective components," and a plaintiff must satisfy both elements to establish an Eighth Amendment violation. *Chance,* 143 F.3d at 702; *accord Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998).

The objective prong of the analysis requires a prisoner to demonstrate that the alleged medical need is "sufficiently serious." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) ("*Hathaway I*") (citing *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). A condition constitutes a serious medical need under the Eighth Amendment if it is "a condition of urgency, one that may produce death, degeneration or extreme pain." *Morales v. Mackalm,* 278 F.3d 126, 132 (2d Cir.2002) (citing *Hathaway I,* 37 F.3d at 66). Under the subjective component, the prisoner must show that the defendant acted with a "sufficiently culpable state of mind" in depriving the prisoner of adequate medical treatment. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("Hathaway II"). "The subjective element of deliberate indifference 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." ' *Hathaway II,* 99 F.3d at 553 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835 (1994)). The official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

## III. *Application of the Standards*

**\*4** Regarding the objective inquiry, there are serious questions regarding whether Plaintiff could demonstrate at trial that his injury is sufficiently serious to support an Eighth Amendment violation. Most courts have held

that a broken finger does not constitute a serious medical need. *See, e.g., Magee v. Childs,* No. 9:04-CV-1089 (GLS) (RFT), 2006 WL 681223, at \*6 (N.D.N .Y. Feb. 27, 2006) ("[I]t has been held that a broken finger does not constitute a serious injury."); *Henderson v. Doe,* No. 98 Civ. 5011(WHP), 1999 WL 378333, at \*2-3 (S.D.N.Y. June 10, 1999) (holding that "conditions that have failed to meet [the 'sufficiently serious'] standard include ... a broken finger"); *Rivera v. S.B. Johnson,* No. 95 Civ. 0845(ECH), 1996 WL 549336, at \*2 (W.D.N.Y. Sept. 20, 1996) ("A broken finger, without more, simply does not present a condition of urgency of the type that may produce death, degeneration or extreme pain which correspondingly merits constitutional protection."); *Rodriguez v. Joyce,* 693 F.Supp. 1250, 1252-53 (D.Me.1988) (broken finger not sufficiently serious to support an Eighth Amendment claim); *but see Leacock v. N.Y. City Health Hosp. Corp.,* No. 03 Civ. 5440(RMB)(GWG), 2005 WL 1027152, at \*5 n.2 (S.D.N.Y. May 4, 2005) (holding that broken finger requiring surgery may be sufficiently serious).

Regardless of the seriousness of Plaintiff's injury, he has failed to show that either van der Steeg or Foster acted with the culpable state of mind required to establish an Eighth Amendment violation.

### A. *Van der Steeg*

The claims against van der Steeg are predicated on his alleged failure (1) to provide "prompt medical care" after Ravenell fractured his finger; (2) to correctly set the fracture; and (3) to take a post-setting x-ray. (Complaint, dated June 29, 2005 ("Compl.") ¶ IV).

First, Ravenell's claims regarding van der Steeg's alleged lack of promptness are contradicted by the undisputed evidence. Plaintiff himself testified that van der Steeg began treating him 15-20 minutes after his arrival at Putnam Hospital. (Saul Decl. Ex. P: Transcript of Deposition of Preston Ravenell ("Ravenell Dep.") at 22.) As a matter of law, a wait this brief cannot constitute deliberate indifference to an injury such as Plaintiff's. *See, e.g ., Ramos v. Artuz,* No. 00 Civ. 0149(LTS), 2003 WL 342347, at \*10 (S.D.N.Y. Feb. 14, 2003) ("[T]he Second Circuit has reserved [a deliberate indifference] classification [arising from defendants' delay] for cases in which, for example, officials ignored a life-threatening and fast-degenerating condition for three days, or delayed major surgery for over two years" (internal citations and quotations omitted); *Espinal v. Coughlin,* No. 98 Civ.

2579(RPP), 2002 WL 10450, at *3 (S.D.N.Y. Jan. 3, 2002) (same).

Nor are the remainder of Plaintiffs' allegations supported by evidence that van der Steeg "knew[ ] of and disregarded an excessive risk to [Plaintiff's] health or safety." *Farmer,* 511 U.S. at 837. Assuming that Plaintiff is correct in asserting either that van der Steeg neglected to set the fracture or that he did so improperly, there is no evidence that van der Steeg acted with a culpable state of mind. Plaintiff has also failed to show that van der Steeg deliberately neglected to take a post-setting x-ray. Indeed, all of the evidence regarding van der Steeg's state of mind shows concern for Ravenell's well being. Van der Steeg promptly examined Plaintiff's hand, gave him a prescription for pain medication, and recommended that Plaintiff follow up with an orthopedic specialist within a week.

 **\*5** Absent any evidence of scienter, van der Steeg could only have acted negligently in treating Plaintiff. Indeed, when Plaintiff was asked at his deposition to describe van der Steeg's alleged infractions, he answered "total neglect" and "malpractice." (Ravenell Dep. at 17.) It is well settled that mere "negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim." *Chance,* 143 F.3d at 703; *see also Estelle,* 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of mistreatment under the Eighth Amendment."); *Hathway II,* 99 F.3d at 553 ("[M]ere medical malpractice is not tantamount to deliberate indifference.") (internal citation omitted); *Johnson v. Newport Lorillard,* No. 01 Civ. 9587(SAS), 2003 WL 169797, at *2 (S.D.N.Y. Jan. 23, 2003) (holding that "[b]ecause the inadvertent or negligent failure to provide adequate medical care does not rise to the level of deliberate indifference, allegations of medical malpractice or negligent treatment are insufficient to state a claim under [Section] 1983"). In particular, the failure to treat a fracture properly or to order an x-ray is not actionable absent some evidence of deliberate behavior by the treating physician. *See, e.g., Estelle,* 429 U.S. at 107 ("A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment."); *Houston v. County of Westchester Dep't of Corr.,* No. 06 Civ. 3395(DC), 2006 WL 3498560, at *4-6 (S.D.N.Y. Dec. 5, 2006) (failure to set an arm fracture not deliberate indifference); *Palacio v. Ocasio,* No. 02 Civ. 6726(PAC)

(JCF), 2006 WL 2372250, at *11 (S.D.N.Y. Aug. 11, 2006) ("Defendant['s] decision not to x-ray Palacio's jaw and his failure to diagnose the fracture do not support a claim under 42 U.S.C. § 1983" absent evidence of "a culpable recklessness in the manner in which [the defendant] diagnosed Palacio's injury."); *Torres v. Alers,* No. 04 Civ. 1127(LAP), 2005 WL 2372741, at *3 (S.D.N.Y. Sept. 26, 2005) ("At most, Defendant might be accused of negligence in failing to order an x-ray of Plaintiff's ankle, but ... simple negligence, even if it amounts to medical malpractice, does not establish deliberate indifference."). The record evidence is insufficient to establish that van der Steeg was deliberately indifferent to Ravenell's injury.

*2. Dr. Foster*
The claims against Foster are predicated on his failure to provide Ravenell with "prompt surgery." (Compl.¶ IV-A(3).) Yet Foster did promptly prescribe physical therapy. Although he noted at the outset of Plaintiff's treatment that surgery might be required if physical therapy was unsuccessful. Plaintiff's finger responded positively to the physical therapy. (Saul Decl. Exs. H, J, K, M.) When Plaintiff voiced his disagreement with Foster's recommendation and declared his preference for surgery, Foster promptly recommended that Plaintiff obtain a second opinion from Magill. Magill then performed surgery on Plaintiff's finger four months after physical therapy was initially prescribed.

 **\*6** Plaintiff offers no evidence to contradict Foster's contention that, in his medical judgment, it was prudent to follow a conservative approach to Plaintiff's injury before exposing Plaintiff to the risks of surgery. That Magill disagreed with Foster does not transform Foster's conservative recommendation into cruel and unusual punishment. The question of what diagnostic techniques and treatments should be administered to an inmate is a "classic example of a matter for medical judgment"; accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107. "While a plaintiff may be able to state an Eighth Amendment claim where a doctor acts without medical justification, 'no claim is stated when a doctor disagrees with the professional judgment of another doctor.' " *McKenna v. Wright,* No. 01 Civ. 6571(WK), 2002 WL 338375, at *8 (S.D.N.Y. Mar. 4, 2002) (quoting *White v. Napolean,* 897 F.2d 103, 110 (3d Cir.1990)); *see also Douglas v. Stanwick,* 93 F.Supp.2d 320, 325

(W.D.N .Y.2000) (finding no deliberate indifference where plaintiff's physician countermanded a different doctor's treatment decision based on her medical judgment); *Mercer v. Green Haven Corr. Facility,* No. 94 Civ. 6238(DLC), 1998 WL 85734, at *6 (S.D.N.Y. Feb. 27, 1998) (holding that disagreement among the prisoner's physicians does not constitute deliberate indifference); *Gardner v.. Zaunbrecher,* No. 95 Civ. 1543(RSP), 1996 WL 507072, at *2 (N.D.N .Y. Sept. 4, 1996) (Pooler, J.) (same); *Webb v. Jackson,* No. 92 Civ. 2149(SS), 1994 WL 86390, at *3 (S.D.N.Y. Mar. 16, 1994) ("It is well established that a mere difference in opinion, whether between doctors or laymen, based on medical care does not give rise to an Eighth Amendment violation of inadequate medical treatment ...").

In particular, the courts have rejected deliberate indifference claims predicated on a physician's good faith recommendation of conservative treatment, regardless of whether another physician ultimately prescribed a more aggressive approach. *See, e.g., Sully-Martinez v. Glover,* No. 00 Civ. 5997(GEL), 2001 WL 1491278, at *6 (S.D.N.Y. Nov. 26, 2001) ("Defendants' decision to pursue more conservative treatments for Sully-Martinez's problem reflects, at most, a difference in opinion as to his medical treatment, rather than any deliberate indifference to his medical needs."); *Culp v. Koenigsmann,* No. 99 Civ. 9557(AJP), 2000 WL 995495, at *9 (S.D.N.Y. July 19, 2000) (summary judgment granted in favor of defendant doctors who chose more conservative treatment despite another doctor's recommendation of surgery); *Nelson v. Baggia,* No. 92-3175, 1994 WL 230455, at *3 (C.D.Ill. Feb. 22, 1994) (no deliberate indifference where conservative treatment was followed by surgery). Foster proffers the testimony of Dr. Malcolm Roth, who opines that "[a]lthough some hand specialists might have chosen [surgery], closed treatment with a splint and close follow up with x-rays is a common and accepted form of treatment for this type of injury." (Declaration of Malcolm Z. Roth, dated Mar. 3, 2006 ("Roth Decl.") ¶ 15.) Defendants also offer evidence that no long-term consequences arose from the four-month

delay in surgery. (Roth Decl. ¶ 18.) Plaintiff fails to contradict any of Defendants' evidence. *Arroyo v. City of New York,* No. 99 Civ. 1458(JSM), 2003 WL 22211500, at *3 (S.D.N.Y. Sept. 25, 2003) (no deliberate indifference where "Plaintiff ... did not present any medical opinion testimony to support his argument that it was unreasonable to first attempt to treat his hernia non-surgically, and to resort to surgery only after such methods had failed")

**\*7** Indeed, Plaintiff offers only his own conclusory allegations that Foster consciously disregarded a substantial risk of serious harm through deliberate delay of treatment. (*See* Pl. Mem. at 10.) Plaintiff's " 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)); *see also Sully-Martinez,* 2001 WL 1491278, at *5 (granting summary judgment on Plaintiff's Eighth Amendment claim despite the plaintiff's "conclusory assertions" of deliberate indifference). No reasonable juror could conclude that Foster acted with deliberate indifference.

Because Plaintiff has failed to show that either Defendant acted with deliberate indifference, this Court need not reach the question of qualified immunity. *See Culp,* 2000 WL 995495, at *10.

## CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is granted. The Clerk of the Court is directed to mark this case closed.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 765716

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Rivera v. Johnson, Not Reported in F.Supp. (1996)

1996 WL 549336

Case 9:16-cv-00541-FJS-DEP   Document 57   Filed 08/07/18   Page 79 of 82

KeyCite Yellow Flag - Negative Treatment
Distinguished by Carter v. Revine, D.Conn., October 6, 2015

1996 WL 549336
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Felix RIVERA, Plaintiff,
v.
S.B. JOHNSON, Superintendent, Dr. Shinia, Head
Doctor, Admin R.N. E. James, Administrative
Nurse, and R.N. J. Kent, Nurse, Defendants.

No. 95–CV–0845E(H).
|
Sept. 20, 1996.

**Attorneys and Law Firms**

Plaintiff Pro Se, Albion, NY.

Mary C. Baumgarten, Asst. Attorney General, Buffalo,
NY, for Defendant.


MEMORANDUM and ORDER

ELFVIN, District Judge.

**\*1**  The plaintiff—an inmate housed at New York's
Orleans Correctional Facility ("Orleans")—commenced
this action pursuant to 42 U.S.C. § 1983 alleging that
he had been denied adequate medical care in violation
of his right under the Eighth Amendment to the United
States Constitution to be free from cruel and unusual
punishment. Jurisdiction is bottomed upon 28 U.S.C. §§
1331 & 1343(a). The defendants move, pursuant to Rule
12(b)(6) of the Federal Rules of Civil Procedure, to dismiss
the Complaint for its failure to state facts upon which
relief may be granted. The motion will be granted.

According to the plaintiff's Statement of Claim
("Complaint"), at approximately 4:30 p.m. on June 26,
1995 he injured his fourth finger on his right hand and
was taken to the clinic within Orleans where he was seen
by Joanne V. Kent, R.N. The plaintiff alleges that Kent
"refused to X-ray [his] hand and * * * [w]rapped" his
finger and instructed him "to come back if the swelling
continues." Two days later the plaintiff "was taken to
a hospital * * * at which time [his] finger was X-rayed

and a cast provided." The plaintiff alleges that Kent "was
negligent in not properly treating [his] broken finger,"
that Elizabeth James, R.N., "is directly responsible" in
her administrative position to furnish a capable medical
staff which can provide "the proper treatment to inmate[s]
during emergenc[ies]" and that she was "negligent by
staffing * * * Kent," that Brij N. Shinha, M.D.—sued
herein as "Dr. Shinia"—"is the head doctor, and is directly
responsible for the negligence of his staff" and that
Superintendent Sally B. Johnson "is directly responsible"
to assure "that inmates with emergency needs will receive
adequate medical treatment and not be subjected to gross
negligence, wanton disregards [sic], or mistreated because
it is trying to save a few dollars." Finally, in his prayer
for relief, the plaintiff requests that this Court "find that
the medical dept. has acted negligent [sic] by displaying
a wanton disregard to severe medical emergency needs"
and that by subjecting him to "medical neglect during
an emergency situation [it] has created mental anguish,
gross negligence" and that he should be pecuniarily
compensated.

When evaluating a motion to dismiss for failure to state
a claim upon which relief can be granted this Court views
well-pleaded allegations in a light most favorable to the
plaintiff and such a motion will be denied unless they
present no set of facts on the basis of which the plaintiff
could be entitled to relief. *Scheuer v. Rhodes,* 416 U.S. 232,
236 (1974). This lenient standard is even more appropriate
when the plaintiff is representing himself. *Sykes v. James,*
13 F.3d 515, 518–519, (2nd Cir.1993), *cert. denied,* 512
U.S. 1240, 114 S.Ct. 2749 (1994).

A claim for damages based upon 42 U.S.C. § 1983
requires that the plaintiff allege facts which show that
he was deprived, by a person or persons acting under
state authority, of a right, privilege or immunity protected
under the Constitution or a federal statute. *Sykes,*
at 519. In order to recover damages under section
1983, the plaintiff must establish a defendant's personal
involvement in the alleged deprivation. *Wright v. Smith,*
21 F.3d 496, 501 (2nd Cir.1994). The plaintiff "must
state specific facts, not simply legal and constitutional
conclusions." *Fee v. Herndon,* 900 F.2d 804, 807 (5th
Cir.), *cert. denied,* 498 U.S. 908 (1990). Furthermore, the
doctrine of *respondeat superior* may not be invoked to
establish an individual's liability in a section 1983 claim.
*Green v. Bauvi,* 46 F.3d 189, 194 (2nd Cir.1995).

Rivera v. Johnson, Not Reported in F.Supp. (1996)

1996 WL 549336

**\*2** The Eighth Amendment to the United States Constitution prohibits the infliction of unnecessary and wanton pain on those convicted of crimes. *Hudson v. McMillian,* 503 U.S. 1, 5 (1992). If an inmate suffers from a sufficiently serious illness or injury or other medical condition, a deliberate indifference to such serious medical needs violates the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 104–105 (1976). The inquiry has both objective and subjective elements. *Wilson v. Seiter,* 501 U.S. 294, 298 (1990). The objective component of the inquiry examines whether the deprivation was sufficiently serious, while the subjective component examines whether any defendant acted with a sufficiently culpable state of mind. *Ibid.* In examining the seriousness of the medical need, the constitutional "standard contemplates 'a condition of urgency, one that may produce death, degeneration, or extreme pain' \* \* \*." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2nd Cir.1994), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108 (1995). The subjective component requires the plaintiff to demonstrate that a defendant was both aware of facts from which the inference could have been drawn that a substantial risk of serious harm existed and that such defendant drew such inference. *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 1979 (1994).

Evaluating the Complaint, the plaintiff has failed to allege sufficient personal involvement on the part of James, Shinha and Johnson to state a claim for a constitutional violation for which monetary damages can be awarded. His allegations of negligent supervision or staffing rely on theories of negligence and vicarious liability, neither of which is available to establish liability in section 1983 actions. In the absence of allegations of direct personal involvement and sufficiently egregious and morally culpable conduct, the plaintiff's claims against James, Shinha and Johnson must be dismissed as a matter of law.

The gravamen of the complaint against Kent is that she "refused to X-ray" the plaintiff's finger or hand and that she "wrapped" his finger and that as a result of her conduct he unnecessarily endured pain for two days prior to being taken to a hospital, where his "finger was X-rayed and [placed in] a cast." The United States Supreme Court has specifically held that "[a] medical decision not to order an X-ray \* \* \* does not represent cruel and unusual punishment." *Estelle,* at 107. Furthermore, the plaintiff has failed to allege an objectively sufficiently serious medical condition meriting constitutional protection. Prison inmates suffering from ailments such as, *inter alia,* a toothache, a kidney stone and, most pertinently, a broken finger have all been held to fail to satisfy the constitutional serious-medical-need standard. *See Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995) and cases cited thereat. A broken finger, without more, simply does not present a condition of urgency of the type that may produce death, degeneration or extreme pain which correspondingly merits constitutional protection. Additionally, the Complaint indicates that Kent attended to and treated his finger and instructed the plaintiff to return if swelling continued. Such does not imply any disregard on her part of an excessive risk to the plaintiff's health. There is no allegation that the two days which passed after Kent attended to the plaintiff's finger and until it was placed in a cast, even if viewed as a delay, escalated or contributed to any harm or adversely affected his prognosis given the type of injury. Negligent diagnosis or treatment of a medical condition at most states a claim for medical malpractice and does not state a valid claim of medical mistreatment of constitutional dimension. *Estelle,* at 106–107. Moreover, it has long been resolved that prisons need not provide a standard of medical care presumed to be administered at hospitals. *Archer v. Dutcher,* 733 F.2d 14, 17 (2nd Cir.1984). Having failed to allege a medical condition that is objectively sufficiently serious and having failed to allege facts which imply deliberate indifference to such, the plaintiff's legal and constitutional conclusions fail to state a claim upon which relief can granted.

**\*3** Accordingly, it is hereby *ORDERED* that the defendants' motion is granted and that the Complaint is dismissed and that this case shall be closed.

### All Citations

Not Reported in F.Supp., 1996 WL 549336

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:16-cv-00541-FJS-DEP    Document 57    Filed 08/07/18    Page 81 of 82

Robinson v. Delgado, Not Reported in F.Supp. (1998)

1998 WL 278264

1998 WL 278264
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Anthony ROBINSON, Plaintiff,

v.

Jane DELGADO, Hearing Officer and
Lieutenant; and Donald Selsky, Director of
Inmate Special Housing Program, Defendants.

No. 96–CV–169 (RSP/DNH).
|
May 22, 1998.

**Attorneys and Law Firms**

Anthony Robinson, Veterans Shelter, Brooklyn, for
Plaintiff, Pro Se.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Attorney for Defendants, Albany, Ellen Lacy
Messina, Esq., Assistant Attorney General, of Counsel.


ORDER

POOLER, D.J.

 **\*1** Anthony Robinson, a former inmate incarcerated
by the New York State Department of Corrections
("DOCS"), sued two DOCS employees, alleging that
they violated his right to due process in the course
of a disciplinary proceeding and subsequent appeal.
On September 9, 1997, defendants moved for summary
judgment. Defendants argued that plaintiff failed to
demonstrate that the fifty days of keeplock confinement
that he received as a result of the hearing deprived
him of a liberty interest within the meaning of the Due
Process Clause. Plaintiff did not oppose the summary
judgment motion, and Magistrate Judge David N. Hurd
recommended that I grant it in a report-recommendation
filed April 16, 1998. Plaintiff did not file objections.

Because plaintiff did not file objections, I "need only
satisfy [myself] that there is no clear error on the face
of the record in order to accept the recommendation."
Fed.R.Civ.P. 72(b) advisory committee's note. After
reviewing the record, I conclude that there is no clear
error on the face of the record. After being warned

by defendants' motion that he must offer proof in
admissible form that his disciplinary confinement imposed
an "atypical and significant hardship on the inmate
in relation to the ordinary incidents of prison life,"
Robinson failed to offer any such proof. *Sandin v. Conner,
515 U.S. 472, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418
(1995).* Consequently, he cannot maintain a due process
challenge. *Id.* Therefore, it is

ORDERED that the report-recommendation is
approved; and it is further

ORDERED that defendants' motion for summary
judgment is granted and the complaint dismissed; and it
is further

ORDERED that the Clerk of the Court serve a copy of
this order on the parties by ordinary mail.


HURD, Magistrate J.


REPORT—RECOMMENDATION

The above civil rights action has been referred to the
undersigned for Report and Recommendation by the
Honorable Rosemary S. Pooler, pursuant to the local
rules of the Northern District of New York. The plaintiff
commenced the above action pursuant to 42 U.S.C. § 1983
claiming that the defendants violated his Fifth, Eighth,
and Fourteenth Amendment rights under the United
States Constitution. The plaintiff seeks compensatory and
punitive damages.

Presently before the court is defendants' motion for
summary judgment pursuant to Fed. R. Civ. P. 56.
However:

> When a motion for summary
> judgment is made and supported as
> provided in this rule, an adverse
> party may not rest upon the mere
> allegations or denials of the adverse
> party's pleading, but the adverse
> party's response, by affidavits or
> as otherwise provided in this rule,
> must set forth specific facts showing
> that there is a genuine issue for
> trial. If the adverse party does not
> so respond, summary judgment, if

appropriate, shall be entered against the adverse party.

Fed. R. Civ. P 56(e).

In addition, "[f]ailure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." L.R. 7.1(b)(3).

 **\*2** The defendants filed their motion on September 9, 1997. The response to the motion was due on October 23, 1997. It is now five months beyond the date when the plaintiff's response was due, and he has failed to file any papers in opposition to defendants' motion.

Therefore, after careful consideration of the notice of motion, affirmation of Ellen Lacy Messina, Esq., with exhibits attached, and the memorandum of law; and there being no opposition to the motion; it is

RECOMMENDED that the motion for summary judgment be GRANTED and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(l), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696(1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(l); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Order and Report–Recommendation, by regular mail, upon the parties to this action.

**All Citations**

Not Reported in F.Supp., 1998 WL 278264

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.